RECEIVED **IN THE UNITED STATES DISTRICT COURT** **[ FILED ]**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

2001 DEC 28  A 9: 12

DEC 2 8 2001

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | | |
|---|---|---|
| CHRISTOPHER BARBOUR; TONY BARKSDALE; JAMES BORDEN; JAMES CALLAHAN; EUGENE CLEMONS; GARY HART; GLENN HOLLADAY; and ANTHONY TYSON individually and on behalf of all persons similarly situated, | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * | Civil Action No. CV-01-D-1530-N <br><br> **CLASS ACTION** |
| PLAINTIFFS, | * <br> * | |
| vs. | * <br> * | |
| MICHAEL HALEY, in his official capacity as Commissioner for the Alabama Department of Corrections; STEPHEN BULLARD, BILLY MITCHEM, in their official capacities as Wardens of William E. Donaldson Correctional Facility; CHARLIE JONES, in his official capacity as Warden of Holman State Prison; and DON SIEGELMAN, in his official capacity as Governor of the State of Alabama, | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * | |
| DEFENDANTS. | * | |

---

**COMPLAINT**

---

1

## INTRODUCTION

1.     This is a class action brought by Plaintiffs, prisoners under sentence of
death and incarcerated in Alabama's death row prisons, to obtain relief from acts of
the State of Alabama, the Alabama Department of Corrections, and certain prison
wardens and their agents that impair the condemned prisoners' fundamental
constitutional right of access to the courts.  Despite the recognized importance of
state collateral relief proceedings in death penalty cases and the severity of the
consequences of a failure to file a thorough and timely petition, Alabama provides
no mechanism whatsoever to assist condemned inmates to obtain any sort of aid
from counsel in preparing and presenting postconviction claims.  While the
fortunate death row prisoner who has managed without representation to file a
postconviction petition that properly articulates a valid claim may be able to obtain
a court-appointed attorney after filing, Alabama's $1000 cap on the compensation
available to such attorneys forces the attorney to choose between a bare minimum
of representation and litigating the constitutional challenge properly on a *pro bono*
basis.

2.     Those condemned prisoners who do successfully obtain *pro bono*
counsel find their access to their attorneys severely curtailed by the arbitrary and
unreasonable visitation policies and practices of Alabama's death row prisons,
Holman State Prison and William E. Donaldson Correctional Facility.  These
prisons unreasonably restrict the ability of death row prisoners to meet with their
attorneys and other important members of their legal teams for the critical purpose

2

of investigating and presenting constitutional challenges to their convictions and/or sentences.  In so doing, they deny death row prisoners the opportunity to seek and receive legal assistance, and make it all but impossible for condemned prisoners to find and recruit the services of volunteer counsel in the first place.

3.      The named Plaintiffs file this action on behalf of themselves and similarly situated past, present and future death row prisoners in Alabama against the Governor of Alabama, the Commissioner of the Alabama Department of Corrections, and the Wardens of Holman State Prison and William E. Donaldson Correctional Facility to obtain relief from these and related acts of the Defendants that cumulatively violate the Plaintiffs' rights of meaningful access to the courts in violation of the First, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

4.      Plaintiffs seek an order of the Court prohibiting Defendants from continuing to impede Plaintiffs' constitutional rights of access to the courts and requiring Defendants to take appropriate steps to enable Plaintiffs to exercise those rights. Because the cumulative effect of Defendants' actions is to create an unlawful and unconstitutional impediment to Plaintiffs' filing of federal habeas applications, Plaintiffs seek a declaratory judgment that, pursuant to 28 U.S.C. Sec. 2244(d)(1)(B), the one-year federal habeas statute of limitations has not yet begun to run and will not begin to run until Defendants have removed the unlawful impediment.  Moreover, because the cumulative effect of such actions constitutes extraordinary circumstances which are clearly beyond Plaintiffs' control and are

3

unavoidable even with due diligence and which prevent timely filing of an application for federal habeas corpus, Plaintiffs seek in the alternative the equitable tolling of the one-year federal habeas statute of limitations.

## JURISDICTION

5.     This is a civil action authorized by 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights, privileges and immunities guaranteed by the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 (a)(3) and (4).  This Court also has jurisdiction over Plaintiffs' action for declaratory relief pursuant to 28 U.S.C. § 2201.  Injunctive relief is authorized by 28 U.S.C. § 2202 and 42 U.S.C. § 1983.

6.     Venue is appropriate in the Middle District of Alabama under 28 U.S.C. § 1391(b) and § 1392.

## PLAINTIFFS

7.     Plaintiff Christopher Barbour is under a sentence of death and is currently in the custody of the State of Alabama at the Holman Correctional Facility.  He is an adult male resident of Escambia County, Alabama.

8.     Plaintiff Tony Barksdale is under a sentence of death and is currently in the custody of the State of Alabama at the Holman State Prison.  He is an adult male resident of Escambia County, Alabama.

9.     Plaintiff James Borden is under a sentence of death and is currently in the custody of the State of Alabama at the Donaldson Correctional Facility.  He is an adult male resident of Jefferson County, Alabama.

4

10. Plaintiff James Callahan is under a sentence of death and is currently in the custody of the State of Alabama at the Holman State Prison. He is an adult male resident of Escambia County, Alabama.

11. Plaintiff Eugene Clemons is under a sentence of death and is currently in the custody of the State of Alabama at the Holman State Prison. He is an adult male resident of Escambia County, Alabama.

12. Plaintiff Gary Hart is under a sentence of death and is currently in the custody of the State of Alabama at the Holman State Prison. He is an adult male resident of Escambia County, Alabama.

13. Plaintiff Glenn Holladay is under a sentence of death and is currently in the custody of the State of Alabama at the Holman State Prison. He is an adult male resident of Escambia County, Alabama.

14. Plaintiff Anthony Tyson is under a sentence of death and is currently in the custody of the State of Alabama at the Holman State Prison. He is an adult male resident of Escambia County, Alabama.

## DEFENDANTS

15. Defendant Michael W. Haley is an adult citizen of Montgomery County, Alabama. He is the Commissioner for the Alabama Department of Corrections, which is responsible for the maintenance and operation of all Alabama prisons, including Holman State Prison and William E. Donaldson Correctional Facility. He is sued in his official capacity.

5

16.     Defendant Stephen Bullard is an adult citizen of Jefferson County, Alabama. He is the warden of William E. Donaldson Correctional Facility, where death row prisoners are currently confined. He is responsible for the management and supervision of that facility and the prisoners confined therein, including the plaintiff class confined under sentence of death. He has custody and control over Plaintiffs. He is sued in his official capacity.

17.     Defendant Billy Mitchem is an adult citizen of Jefferson County, Alabama. He was the warden of William E. Donaldson Correctional Facility, where death row prisoners were at the time, and are currently, confined. He was responsible for the management and supervision of that facility and the prisoners confined therein, including the plaintiff class confined under sentence of death. He had custody and control over Plaintiffs. He is sued in his official capacity.

18.     Defendant Charlie Jones is an adult citizen of Escambia County, Alabama. He is the Warden of Holman State Prison, where death row prisoners are currently confined. He is responsible for the management and supervision of that facility and the prisoners confined therein, including the plaintiff class confined under sentence of death. He has custody and control over Plaintiffs. He is sued in his official capacity.

19.     Defendant Don Siegelman is an adult citizen of Montgomery County, Alabama. He is the Governor of the State of Alabama. He is sued in his official capacity.

6

20.    At all times and during all incidents relevant to this complaint, Defendants were acting under the color of state law.

<u>CLASS ACTION ALLEGATIONS</u>

21.    This is a class action brought by Plaintiffs Christopher Barbour, Tony Barksdale, James Borden, James Callahan, Eugene Clemons, Gary Hart, Glenn Holladay, and Anthony Tyson pursuant to Fed. R. Civ. P. 23(b)(2), on behalf of themselves and all death row prisoners who are denied their right of meaningful access to the courts.

22.    This action is maintainable on behalf of this class because:

(a)    The class is so numerous that joinder of all members is impracticable.

(b)    There are questions of law and fact common to the class.

(c)    The claims of the representative parties are typical of the claims of the class.

(d)    The representative parties will fairly and adequately protect the interests of the class.

23.    In particular, the questions of law or fact that are common to the claims of the representative parties and the claims of each member of the class include:

(a)    Whether the Defendants' various and cumulative actions deprive the Plaintiffs and each member of the class of meaningful access to the courts in violation of their rights under

7

the First, Sixth, Eighth and Fourteenth Amendments to the
United States Constitution;

(b)     Whether the Defendants' unconstitutional actions constitute an

unlawful or unconstitutional impediment, within the meaning of

28 U.S.C. § 2244(d)(1)(B), to the timely filing of federal habeas

applications by the Plaintiffs and each class member, such that

the statute of limitations for filing such petitions has not yet

begun to run and shall not begin to run until the impediment is

removed;

(c)     Whether the Defendants' unconstitutional actions constitute

extraordinary circumstances that are both beyond Plaintiffs'

control and unavoidable even with due diligence and which

prevent timely filing of federal habeas petitions by the Plaintiffs

and each class member, such that the statute of limitations for

filing such petitions should be equitably tolled.

24.     The claims of the representative parties are typical of the claims of
each member of the class in that:

(a)     Each member of the class has been sentenced to death in the

state of Alabama;

(b)     Each member of the class is currently in the custody of the State

of Alabama Department of Corrections in either Holman State

Prison or Donaldson Correctional Facility;

8

(c)     Each member of the class has colorable constitutional claims of invalidity of his conviction and/or death sentence;

(d)     For each member of the class, state and federal collateral review proceedings represent a crucial forum for the vindication of such claims;

(e)     Each member of the class has been thwarted in his efforts to pursue state and federal postconviction relief, and thereby denied meaningful access to the courts, by the unconstitutional, unreasonably restrictive policies imposed at death row prisons in Alabama;

25.     The approximate number of the class members is believed to be at least 184.

26.     The representative parties will fairly and adequately protect and represent the interests of each member of the class in that:

(a)     The claims of the representative parties are typical of the claims of each member of the class and common to each member of the class as set forth above; and

(b)     The representative parties have retained the undersigned counsel to represent them, and the undersigned counsel are experienced in this kind of litigation and well able to represent the class.

9

FACTUAL ALLEGATIONS

I.   Unlike Most Death Penalty Jurisdictions, Alabama Fails to Provide Any
     Mechanism for Ensuring that Death Row Prisoners' Have Meaningful Access
     to Counsel for the Purpose of Pursuing Their Claims for Collateral Relief.

27.    Currently, there are 184 people under sentence of death in Alabama.

Alabama now has the third largest death row per capita in the United States.

28.    The number of death sentenced prisoners in Alabama is growing at a

pace that greatly exceeds that in other death penalty jurisdictions.  For the past two

years, Alabama has sentenced more people to death per capita than any other state

in the nation.  In 1998 and 1999, Alabama sentenced 41 individuals to death. In

contrast, Louisiana, with almost exactly the same population as Alabama,

sentenced only 19 people to death in the same period.  Georgia, a state with twice

the population of Alabama, sentenced half as many people to death in the same

time period.  As a result, in the last ten years – since 1990 – the size of Alabama's

death row has doubled. The rate of increase in Alabama's population of condemned

prisoners is likely to continue in the immediate future: upon information and belief,

there are currently over 300 people awaiting capital murder trials across the State

of Alabama, though Alabama has a population of only 4.5 million.

29.    While lawyers are appointed to handle trials and direct appeals in

Alabama death penalty cases, Alabama is one of the only jurisdictions in the

country that has no state-funded mechanism for providing lawyers to death row

prisoners once a conviction and death sentence is affirmed by state courts on direct

appeal.  In contrast, in other states in the Eleventh Circuit, there are state funded

10

services to assist death row prisoners in the timely filing of state collateral challenges to their convictions and sentences.[1]  In most American jurisdictions, either a state-wide public defender system ensures that indigent persons receive access to counsel or state-funded agencies have been created to provide legal representation to death row prisoners for state and federal collateral review procedures.  See, e.g., Fla. Stat. § 27.702 (2000); 2000 Miss. Laws Ch. 569 (H.B. 1228); Tenn. Code Ann. § 40-30-301-309 (1999); N.C. Gen. Stat. Ann. § 7A-486.3 (2000); Cal. Gov. Code § 68661 (2000); Ill. Stat. Ch. 725, § 5, 122-4 (2000); Okla. Stat. Tit. 22, § 1089 (2000).

30.    Access to counsel following the conclusion of direct review is crucial for death row prisoners.  State and federal collateral proceedings are a central part of the review process in capital cases.  Under Alabama law, certain claims, including claims of ineffective assistance of counsel, jury misconduct, and violations of Brady v. Maryland, 373 U.S. 83 (1963), ordinarily cannot be raised on direct appeal but are relegated to postconviction proceedings.  Death row prisoners in Alabama have only two years to obtain and review the full record of their trial and direct appeal, perform any necessary investigation and legal research, and prepare a

---

[1] For example, the Georgia Appellate Practice and Educational Resource Center received nearly $1 million dollars in its 1999 appropriation from the Georgia legislature.  See Supreme Court of Georgia, *1998 Annual Report on the Work of the Georgia Courts, Judicial Branch in Review, State Appropriations for the Judicial Branch: Fiscal Years 1997, 1998 and 1999.*  In Florida, the Office of the Capital Collateral Representative represents only death-sentenced inmates, and received over $8 million dollars in its 1999 legislative appropriation.  See Mary Smith Judd,

postconviction petition which properly sets forth the factual and legal basis for each of their claims. See Ala. R. Crim. P. 32.2(c). The 1996 Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2244(d), has the effect of cutting this already brief period in half; if a condemned inmate fails to properly develop and pursue his state postconviction claims within one year, he loses his right to seek federal habeas corpus review of the constitutionality of his conviction. Thus, post-AEDPA, the statute of limitations for death row prisoners to bring state collateral challenges is effectively one year.

31.    These severe time limitations, combined with the complexity of the state and federal courts' death penalty jurisprudence and rules governing postconviction proceedings, make it almost impossible for death row prisoners to file successful petitions for collateral relief without the assistance of counsel.[2] Nonetheless, Alabama provides death row prisoners with no state-funded legal services whatsoever in connection with the preparation and timely filing of their state collateral challenges.

32.    Nor does Alabama provide any other mechanism for ensuring that death row prisoners get access to meaningful legal assistance, volunteer or

---

"Changes continue in death sentence appeals arena" *The Florida Bar News*, June 15, 1998.

[2] The Mississippi Supreme Court has recently recognized that "[a]pplications for post conviction relief often raise issues which require investigation, analysis and presentation of facts outside the appellate record. The inmate is confined, unable to investigate, and often without training in the law or the mental ability to comprehend the requirements of [state law]. The inmate is in effect denied

otherwise, in collateral review proceedings. Alabama maintains no structure or process for monitoring or tracking capital cases so that death row prisoners are apprised of filing deadlines.  No paralegals, lawyers or other state funded professionals are available to assist death row prisoners in meeting filing deadlines. There are no resources or state services for case investigation or state institutions or aids to assist prisoners in drafting petitions for collateral relief.  Alabama does nothing to assist condemned prisoners who may have meritorious claims that they have been unconstitutionally convicted or sentenced to death.

33.     Moreover, while Rule 32 of the Alabama Rules of Criminal Procedure does permit a trial judge to appoint counsel *after* a Rule 32 petition has been filed and found to be nondismissible on its face, Ala. R. Crim. P. 32.7(c), the Rule does not provide for appointment of counsel at the critical stages of petition preparation and filing.  Moreover, Alabama state law limits compensation to the appointed counsel to $1000 per case.  Ala. Code § 15-12-23 (1975) (as amended by Act 99-427 (1999)).  This amount does not compensate counsel for the time required to adequately litigate a collateral challenge in a death penalty case.  As a result, any involvement by counsel in a death penalty postconviction proceeding effectively amounts to *pro bono* work.

34.     The increasing number of death row prisoners needing counsel for postconviction appeals has greatly exceeded the supply of volunteer attorneys

---

meaningful access to the courts by lack of funds for this state-provided remedy."
Jackson v. State, 732 So. 2d 187, 190 (Miss. 1999).

willing to take on these difficult cases. Undersigned counsel – the Equal Justice
Initiative of Alabama ("EJI") – is a small, non-profit organization that relies
entirely upon private support. EJI is currently counsel of record for dozens of
condemned prisoners and is simply unable to take on all new postconviction cases.

35.     In addition, while EJI is engaged in continuing efforts to recruit
lawyers from out of state to take cases on a *pro bono* basis, there are many death
row prisoners who are currently without legal representation and who are not able
to file proceedings pursuant to Rule 32 of the Alabama Rules of Criminal Procedure
or under 28 U.S.C. §2254.

II.    Alabama's Death Row Prisons Exacerbate These Problems By Unreasonably
       and Arbitrarily Restricting Prisoners' Ability to Access Members of Their
       Legal Defense Teams.

36.     The problems implicit in finding counsel to file collateral proceedings
for Alabama's rapidly increasing population of condemned prisoners are
exacerbated by the arbitrary, drastic restrictions imposed by the Alabama
Department of Corrections at Holman State Prison (hereinafter "Holman") and
William E. Donaldson Correctional Facility (hereinafter "Donaldson"), including:
Donaldson's policy prohibiting paralegal visits; Holman's limited visitation facilities
and restrictive visiting schedule for legal visits for death row prisoners; Holman's
policy of arbitrarily labeling attorneys as "counsel of record" and then limiting
prisoners' legal visits to only those attorneys; Holman's arbitrary and unreasonable
cancellation of visits for death row prisoners without explanation or warning to the
attorneys; Holman's arbitrary and unreasonable restrictions on visits to death row

14

prisoners by non-legal staff; and Holman's policy of allowing the State's attorneys and experts unequal and unrestricted access to death row prisoners.

37.     These unlawful restrictions and related practices of the Defendants obstruct death row prisoners' efforts to find and recruit the services of counsel and impede their ability to seek and receive effective assistance from those volunteer attorneys they are able to retain.  As such, the restrictions cumulatively operate to deprive the condemned prisoners of their constitutional right to meaningful and effective access to the courts.

A.   Donaldson Prison's Complete Ban on Visits by Paralegals Who Are Not Accompanied by an Attorney Unreasonably Restricts Death Row Prisoners' Ability to Meaningfully Pursue Their Postconviction Claims.

38.     Donaldson prison – through the intentional actions of Warden Bullard and Warden Mitchem – has completely banned access to paralegals who are not accompanied by an attorney.  By unnecessarily increasing the time and expense required to represent a death row prisoner through a ban on paralegals, Donaldson prison has placed unreasonable burdens on the ability of death row prisoners to obtain and access the assistance of counsel.

39.     Many attorneys reside hundreds of miles away from the prisons where death row inmates are incarcerated.  Attorneys who have taken death row cases have done so primarily on a *pro bono* basis, as they are not adequately compensated for their time and expenses.  Paralegals are thus a valuable resource to attorneys whose time and money are limited.  It is often impossible to have an attorney accompany a paralegal to the prison for a legal visit.  In cases where it is possible,

this attorney requirement completely undermines the utility of using paralegals to assist lawyers who simply do not have the time and resources to do all investigation personally.

40.     A restriction against paralegals who are unaccompanied by an attorney further deters lawyers from taking death penalty cases as it increases the cost of representation by requiring attorneys to do everything themselves, including tasks such as investigation, record gathering and document signing, many of which could be easily completed by a paralegal or other assistant, unaccompanied by an attorney.  Attorneys are thus required to expend time and money that would be employed more efficaciously in working on the prisoner's legal problems, or in maintaining their primary practice.

41.     Death row prisoner James Borden is a mentally retarded man who is incarcerated at Donaldson.  His direct appeal counsel has attempted to find postconviction counsel to represent him, while at the same time assisting him in filing a petition before his statute of limitations expired pursuant to the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").

42.     Under the AEDPA, there is a one year statute of limitations for prisoners seeking habeas corpus relief in federal court.  28 U.S.C. § 2244 (d).  This limitations period begins to run at the conclusion of direct review.  28 U.S.C. 2244 (d)(1)(A).  While the time during which a Rule 32 petition is pending does not count toward the federal statute of limitations period, 28 U.S.C. §2244(d)(2), a death row prisoner must file his Rule 32 petition within one year to preserve the opportunity

16

to obtain subsequent federal habeas corpus review. Thus, although the statute of limitations under Rule 32 is two years, AEDPA has effectively shortened the limitations period to one year.

43.     On September 29, 2000, two paralegals who were assisting in the investigation of Mr. Borden's case, attempted to make an appointment to visit Mr. Borden. Donaldson refused to allow them to visit Mr. Borden and informed them that paralegals are no longer allowed to visit death row prisoners without the accompaniment of an attorney.

44.     This ban on paralegals obstructed Mr. Borden's attempt to file a Rule 32 petition within the one year limitations period. Mr. Borden has numerous viable postconviction claims – including ineffective assistance of counsel at both the guilt and penalty phases of his trial – that had to be investigated and presented in a factually specific way during his Rule 32 proceedings in order to avoid dismissal. In addition to impeding Mr. Borden's ability to investigate and present his legal claims, Donaldson's policy of banning paralegals from visiting death row inmates has deterred the recruitment of lawyers who are unable to shoulder the additional cost of representing him in postconviction and federal habeas proceedings. As such, the ban has directly impaired Mr. Borden's efforts to obtain counsel.

45.     The incidents alleged in paragraphs 38 through 44 above are representative of the experiences of many death row prisoners in Alabama.

46.     Warden Bullard's and Warden Mitchem's complete denial of access to all paralegals who are unaccompanied by an attorney, in combination with the

17

other acts of the Defendants alleged in paragraphs 27 through 35 and 47 through 135 herein, are calculated to and do have the effect of thwarting and obstructing the Plaintiffs' access to judicial remedies for the vindication of their constitutional rights. Such acts further constitute an unconstitutional and unlawful impediment to prisoners' timely pursuit of federal habeas relief.

B. Holman Prison's Unreasonably Restrictive Visiting Schedule Directly Interferes With Death Row Prisoners' Ability to Meet and Confer with Their Attorneys at Crucial Stages of Their Postconviction Proceedings.

47.     Holman prison has implemented a restrictive visiting schedule that denies death row prisoners the opportunity to meet and consult with attorneys, in clear violation of their rights of access to the courts.

48.     Holman currently has a population of 825, of whom 160 are confined on death row. Holman prohibits legal visits for all prisoners except on Tuesday, Wednesday and Thursday of each week. Thus, the prison permits legal visits on only twelve to fifteen days per month. The first Tuesday of every month is set aside as an administrative segregation and classification day, further reducing the number of days available for legal visits. Holman also maintains a policy of prohibiting any visits with death row inmates during the week that an execution is scheduled still further reducing the number of days available for legal visits by a month or more each year.

49.     The number of days available for legal visits will continue to decrease in proportion to the rising number of executions as a result of the ever increasing number of individuals convicted of capital crimes in Alabama, Alabama's failure to

18

provide any mechanism for providing attorneys to indigent death row prisoners, and the shortened statute of limitations for filing state and federal habeas petitions under AEDPA.

50.    On the days that Holman does permit legal visits, the prison has dictated that only one visit may occur at a time, both for death row prisoners and for prisoners in the general population.  Visits may only be conducted between 8:00 a.m. and 2:00 p.m.

51.    These restrictions force attorneys to wait up to five weeks between the time they call to schedule an appointment and the day that Holman permits them to see their clients.  In fact, it is not unusual for an attorney to have to wait over a month between the time that he calls to schedule an appointment and the time that he is allowed to see his client.  This is true, no matter the subject of the visit, or the time requested.  This is an unacceptable and unworkable wait. It is critical that attorneys be permitted to see their death row clients soon after a request is made. Because many of these prisoners do not receive counsel until the last minute, by virtue of their forced reliance on volunteer attorneys, it is impossible for visits to be planned this far in advance.  A delay of four to five weeks is likely to result in the dismissal of a petition for untimeliness.

52.    Death row prisoner Glenn Holladay was denied the opportunity to receive assistance from one of his attorneys upon the denial of his federal appeal by the United States Supreme Court on November 27, 2000.  On November 28, 2000, Mr. Holladay's attorney contacted Holman to schedule a one hour appointment to

19

see Mr. Holladay.  The Holman Warden's Office informed him that the first

available appointment was not until December 21, 2000, over three weeks later.

53.     Mr. Holloday's attorney explained to the Warden's Office the

importance of seeing Mr. Holladay as soon as possible because Mr. Holladay, who is

mentally retarded, would not be able to understand what was happening to him

without an explanation from his attorney.  Moreover, this attorney needed to

discuss with Mr. Holladay what, if any, further legal action would be taken in his

case.  The Warden's Office was unwilling to permit the attorney's request for an

appointment within a reasonable period of time.  On December 5, 2000, when the

State filed a motion with the Alabama Supreme Court to set an execution date,

Holman prison had still not allowed Mr. Holladay to meet with his attorney in order

to discuss his case and he was thus precluded from timely filing a response to the

State's Motion to Set an Execution Date.  Because Mr. Holladay was prevented from

meeting with his attorney at a critical juncture in his capital appeal, he was denied

meaningful access to the courts.

54.     The prison similarly obstructed death row prisoner Chris Barbour from

seeing his attorney until more than three weeks after an appointment was

scheduled.  Mr. Barbour was without counsel from April 21, 1998 until January

2001.  On September 8, 2000, the State filed a motion to schedule an execution date

for Mr. Barbour.  On or about November 20, 2000 an out-of-state attorney contacted

the prison to set up an appointment with Mr. Barbour.  The Holman Warden's

20

Office informed him that the soonest available appointment was on or about December 14, 2000, over three weeks away.

55.   The gravity of the situation – Mr. Barbour's pending execution and lack of counsel – required Holman to permit this attorney to visit Mr. Barbour as soon as possible so that the attorney could intervene if necessary and begin investigation into Mr. Barbour's case and the possible avenues of postconviction relief.  Because Mr. Barbour was facing a possible execution date, it was absolutely essential that he talk to a lawyer in order that the lawyer could become familiar with his case, and decide how to proceed as quickly as possible.  Holman's restrictions prevented Mr. Barbour from filing an immediate response to the State's motion, and Mr. Barbour faced an execution date on May 25, 2001.

56.   Holman's restrictive visiting procedures have forced attorneys to expend additional hours and incur additional expenses.

57.   One death row prisoner hired an expert to assist him in his postconviction proceedings.  The prison arbitrarily cancelled the expert's first visit, which required a two day visit.  When the attorney called to schedule a second visit, the Holman Warden's office informed the attorney that the next two day slot available was *after* the prisoner's scheduled postconviction hearing.  As a result, this prisoner's attorney was forced to fund *two* state postconviction hearings instead of just one.  This depleted the prisoner's already limited postconviction funding – as previously articulated, the Alabama statute only provides $1000 per postconviction case – and concomitantly prevented him from employing other experts or

21

investigative assistants or further investigating his case in order to present viable claims to the state and federal courts. These restrictions directly affected the attorney's ability to be an effective advocate for her client. It also discouraged other attorneys who are unwilling or unable to shoulder the financial burden of a death penalty case on their own from taking capital cases in Alabama.

58.    In other cases, Holman's policies have prevented death row prisoners from seeing appointed experts which prevents the experts from completing their evaluations in a manner consistent with professional protocols. One death row attorney called the prison in early December, 2000 to schedule a visit for an expert prior to the prisoner's scheduled hearing in early January, 2001. The Holman Warden's Office informed him that the first available four-hour appointment was not until after the scheduled hearing.

59.    Expert evaluations are critical to providing evidence for a death row prisoner's claim that his trial counsel was ineffective at both the guilt and penalty phases of his trial. Without evaluation by experts, it is impossible for these prisoners to present such evidence, and this directly impinges upon their ability to present viable claims to the courts.

60.    Attorneys themselves must often wait over a month to see their clients. This results in a decreased opportunity to file a state postconviction or federal habeas petition.

61.    For example, one attorney called Holman during the third week of July, 2000, to schedule an appointment to see his client and have him sign papers

necessary for the filing of his postconviction petition. The Holman Warden's Office informed him that the first available appointment was not until August 15, 2000, more than four weeks later. As a result, his right to access the courts was compromised because he was forced to delay the filing of his petition for two weeks, placing him in imminent danger of missing his federal habeas deadline, which could preclude federal habeas review of his case.

62.    Holman's restrictive schedule is particularly disruptive in that it effectively denies death row prisoners meaningful access to attorneys who come from out of state. These attorneys represent their death row clients on a *pro bono* basis in addition to maintaining a full time law practice. They are constrained by limitations imposed by their practice and thus have infrequent opportunities to travel to Alabama. Furthermore, multiple trips are difficult for them because they must pay for their travel expenses. Any money expended on travel expenses necessarily subtracts from the money that these *pro bono* counsel are able to put toward factual development of their client's legal claims. In addition, the Defendants' actions discourage attorneys with limited time and money from taking death row cases, thereby further burdening the prisoners' rights of access to the courts.

63.    Holman's restrictive visiting schedule thus precludes visits for death row prisoners whose attorneys are unable to conform their schedules to that of the Holman Prison. One prisoner had his first visit with his attorney in December, 1998 after his attorney had waited a month to get an appointment. This prisoner

23

was completely denied the opportunity for a second visit the next spring because Holman did not have any time slots available during the week when his attorney was able to travel to Alabama. This prisoner was thus unable to visit with his lawyer, and as such his attorney was precluded from obtaining details about his postconviction case necessary for proper investigation and presentation to the courts.

64.     Another prisoner desired to visit with his out-of-state attorney at Holman Prison in April, 1998.  The attorney made travel arrangements to fly into Birmingham, where the trial had occurred, perform some investigation, and then to drive to Holman on his way to an engagement in Orange Beach.  Holman permitted him the option of only one time slot during the entire time period in which the attorney was able to be in Alabama.  As a result, he was forced to change his travel plans, and fly into Mobile for the one appointment Holman allowed.  In addition to the cost of changing his flight plans, which necessarily detracted from the money that the attorney was able to spend on investigation of his client's case, the attorney spent valuable hours of his limited time in Alabama driving back and forth to Birmingham, hours which could have been spent investigating the case.

65.     Similarly, another death row prisoner was denied the opportunity to see her out-of-state attorney while the attorney was in Alabama on related business in October, 2000.  The attorney attempted to make an appointment to see her client on one of the days she would be in the state, but the Holman Warden's Office informed her that there were no appointments available.  The attorney will thus

24

have to make a second trip to see her client, which will add greatly to her expenses, and further taxes her time.

66.    Not only do these restrictive visiting policies greatly limit a prisoner's ability to seek and receive the assistance of counsel, but they concomitantly discourage attorneys with limited time and money from taking death row cases.

67.    The incidents alleged in paragraphs 47 through 66 above are representative of the experiences of many death row prisoners in Alabama.

68.    Warden Jones' arbitrary and unreasonable restrictions on the scheduling of visits with death row prisoners facing strict deadlines and scarce resources, in combination with the other acts of the Defendants alleged in paragraphs 27 through 46 and 69 through 135, are calculated to and do have the effect of thwarting and obstructing the Plaintiffs' access to judicial remedies for the vindication of their constitutional rights.  Such acts further constitute an unconstitutional and unlawful impediment to prisoners' timely pursuit of federal habeas relief.

C.    Holman's Unreasonable Restrictions on the Length of Attorney and Expert Visits Impede Death Row Prisoners' Ability to Obtain Effective Assistance of Counsel in Postconviction Proceedings.

69.    Holman compounds the harm caused by its restrictive visiting schedules by unreasonably limiting the length of time that an attorney or expert is able to spend with a condemned inmate once a visit has been scheduled.  It then further exacerbates this problem by unreasonably delaying the arrival of the prisoner to the visiting room, thereby reducing even further the length of the visit.

25

These limitations and delays not only greatly inhibit the prisoners' ability to seek and receive assistance of counsel, but also make it difficult for them to develop important expert evidence in support of their viable postconviction claims.

70.     Holman's restrictive visiting polices precluded death row prisoner Eugene Clemons from exercising his right of access to his legal team and the courts. In November, 2000, Mr. Clemons' attorney attempted to make appointments for three experts to evaluate Mr. Clemons before his scheduled hearing in February, 2001. The testimony of these experts was a necessary element in proving the allegations in Mr. Clemons' postconviction petition that his counsel was ineffective at both the guilt and penalty phases of his capital trial.

71.     Mr. Clemons employed the services of a social worker from South Carolina to assist in his case. In October, 2000, Mr. Clemons' attorney called to schedule an eight hour appointment for the social worker to conduct an evaluation of Mr. Clemons. The Holman Warden's Office informed her that the only available appointment was on November 21, 2000, and was a little over four hours long. Due to the impending hearing date, the social worker was forced to travel to Holman from South Carolina for this four-hour appointment, despite the fact that it was insufficient to complete the evaluation; in order for the social worker to complete her evaluation a return trip was required.

72.     Mr. Clemons' attorneys also attempted to schedule a full day appointment for a psychologist to evaluate Mr. Clemons. Again, the Holman Warden's Office refused to grant their request for an eight hour visit. Mr. Clemons'

attorneys obtained appointments on two days in a row, and even these appointments were five weeks away.  The psychologist was thus required to drive from Birmingham to Holman on two separate days to evaluate Mr. Clemons.

73.    The first appointment was for five and a half hours, but there was almost an hour delay in bringing Mr. Clemons to the visiting room.  On the second day, the scheduled appointment was for three and a half hours, but again there was a delay in bringing Mr. Clemons to the visiting room.  The expert was unable to complete her evaluation as a result of the limited time afforded to her by Holman prison.  As a result, Mr. Clemons' attorneys will have to pay this expert for an additional visit in order that she may complete the evaluation.  This has further depleted Mr. Clemons economic resources, impinged on Mr. Clemons right to access the courts, and precluded additional investigation which would allow him to present his state and federal collateral appeals.

74.    Finally, Mr. Clemons' attorneys also attempted to make an appointment for a neuropsychologist to evaluate Mr. Clemons.  The Holman Warden's Office again  informed them that the first available appointment was over a month away.

75.    Mr. Clemons' attorneys are representing him on a *pro bono* basis and must pay all of the fees and expenses for the experts in his case.  Holman's policy requires experts to make multiple visits to Holman to complete evaluations and thus further drains the resources of attorneys who are already volunteering their services at great cost to themselves.  Mr. Clemons' right to access the courts was

27

impeded by Holman's restrictive visiting policies, which forced him to redirect money away from investigating his legal claims, and instead expend it on funding repeated expert visits to Holman.

76.     Attorneys and experts spend a significant portion of their scheduled visits simply waiting for their clients to arrive.  One attorney scheduled a two hour appointment for November 13, 2000, during which she was planning to see two of her death row clients.  Holman personnel took over forty minutes to bring her client to the visiting yard, and as a result she was restricted to a twenty minute visit with this client.

77.     The incidents alleged in paragraphs 69 through 76 above are representative of the experiences of many death row prisoners in Alabama.

78.     Warden Jones' arbitrary and unreasonable restriction on the length of visitation for death row prisoners facing strict deadlines and scarce resources, in combination with the other acts of the Defendants alleged in paragraphs 27 through 68 and 79 through 135, are calculated to and do have the effect of thwarting and obstructing the Plaintiffs' access to judicial remedies for the vindication of their constitutional rights.  Such acts further constitute an unconstitutional and unlawful impediment to prisoners' timely pursuit of federal habeas relief.

D. Holman's Policy of Arbitrarily Identifying Certain Attorneys as "Counsel of Record" and Prohibiting Other Attorneys from Visiting Death Row Prisoners Obstructs Death Row Prisoners' Efforts to Obtain Legal Assistance in Their Pursuit of Collateral Relief.

79.     Not only does Holman Prison restrict the opportunity for death row prisoners to have meaningful access to their attorneys through scheduling limitations, but Holman also restricts the attorneys to whom death row prisoners have access in a manner that unreasonably burdens their right to meaningful legal assistance, and impedes prisoners' access to the courts.

80.     Holman's current policy prohibits death row prisoners from receiving legal visits from any attorney other than those who have been arbitrarily identified by the prison as "counsel of record" for that particular individual.

81.     Holman prison maintains a list of individuals who are "counsel of record" for each death row prisoner. The prison identifies an attorney as "counsel of record" based on its own arbitrary requirements – requirements that do not necessarily correspond to the assertions of the prisoner himself.

82.     Under Holman's scheme, a death row prisoner who does not have an attorney or "counsel of record" to assist him in filing his state post-conviction petition will also be precluded from talking to any attorneys who may assist him in finding counsel, or who are willing to assist in investigation for the purposes of filing a petition.

83.     Without access to counsel or the opportunity to obtain counsel, death row prisoners are effectively precluded from investigation and factual development

29

of their cases.  Even if death row prisoners are able to identify potential legal claims, without counsel they are unable to present factual support for these claims.

84.     Alabama courts have interpreted their procedural rules to require the dismissal of claims that lack factual specificity.  The Alabama Rules of Criminal Procedure provide that petitioners "shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief." Ala. R. Crim. P. 32.3; see also Ala. R. Crim. P. 32.6(b) (state post-conviction petition must contain clear and specific statement of grounds upon which relief is sought, including "full disclosure of the factual basis of those grounds").  Claims not meeting this burden of pleading are due to be dismissed.  Ala. R. Crim. P. 32.7(d); see also Ex parte Boatwright, 471 So. 2d 1257, 1258 (Ala. 1985) (petition should be dismissed summarily if it contains only general statements concerning the nature of legal claims).

85.     Death row prisoner Chris Barbour was without counsel from April 21, 1998 until January 2001.  Mr. Barbour faced execution on May 25, 2001, although he had not received either state appellate review of his post-conviction petition or federal habeas review of his case.

86.     In an effort to assist Mr. Barbour, an out-of-state attorney made an appointment for himself and another attorney from his office to see Mr. Barbour. After confirming this appointment two times before the scheduled visit, these two attorneys arrived for the appointment on January 16, 2001.

30

87.     Approximately 15-20 minutes into the visit, a Holman correctional officer forced one of the attorneys to leave the prison area because the prison had determined that she was not "counsel of record." Not only was Mr. Barbour prevented from seeking and receiving the assistance of this attorney, but Mr. Barbour's relationship with these attorneys was completely undermined by the prison's actions towards this particular attorney. This action was devastating to the formation of an attorney-client relationship between Mr. Barbour and both of these attorneys, and further hampered his ability to investigate and present his claims to both state and federal courts, and denied him meaningful access to the courts.

88.     One death row prisoner who was without counsel was prevented from seeking or obtaining counsel by Holman Prison. This prisoner requested that he be permitted to visit with two private investigators who were going to assist him in finding an attorney to represent him. Holman Warden Charlie Jones denied the request for a visit. Even when an attorney who was considering representing this prisoner requested that his investigator be allowed to visit with this prisoner, the Holman Warden's Office stilled denied his request.

89.     Though this prisoner did not have an attorney, Holman Warden Charlie Jones refused to honor the repeated requests to meet with a private investigator who would be able to assist him both in investigating his case and obtaining legal counsel – made by the death row prisoner himself, as well as the

31

investigators and the attorney – because the requests were not made by the "counsel of record."

90.    As well as impeding a prisoner's ability to investigate and present his claims to the court, this policy places a burden on attorneys to establish themselves as counsel of record. Often Holman requires attorneys to make numerous phone calls, fax letters or obtain court orders in order to establish themselves as counsel of record. A simple statement by either the attorney or the prisoner himself will rarely suffice to establish that a particular attorney is in fact the "counsel of record."

91.    All of these requirements impinge on a prisoner's right to access the courts, as they force the prisoners to redirect money and resources away from investigation of viable legal claims and instead expend money establishing that the attorneys who have been requested to represent them can establish themselves as "counsel of record."

92.    Even if attorneys are able overcome this initial hurdle and establish themselves as "counsel of record," Holman unreasonably cancels scheduled appointments without notice to the attorney.  This is a further reflection of the capriciousness of Holman's policy regarding "counsel of record."

93.    Holman's arbitrary cancellation of a visit prevented death row prisoner Gary Hart from meeting with his attorneys.   Mr. Hart is represented in his state postconviction appeal by  attorneys from  Minneapolis, MN who have accepted his case on a *pro bono* basis.

94.     Approximately five weeks prior to October 20, 2000, the date on which she planned to schedule a visit, one of Mr. Hart's attorneys called Holman to make an appointment for a legal visit with Mr. Hart along with another attorney who had been representing Mr. Hart for eight years and had been to visit him on at least three previous occasions.

95.     The Warden's Office informed the attorney who called that only she would be allowed to visit with Mr. Hart on the requested date because only she was "counsel of record." The Warden's Office further informed this attorney that in order for other counsel to be listed as counsel of record, she would need to fax or send a letter stating as much. Though counsel offered to fax a letter immediately such that Mr. Hart's other attorneys would be permitted to visit with him on the requested date, the Warden's Office refused to allow Mr. Hart's other attorneys to visit on that day.

96.     An appointment was subsequently made for Mr. Hart's other attorneys to visit on a different date, October 19, 2000. The Holman Warden's Office approved this visit and simply requested that a letter of confirmation be sent. Counsel for Mr. Hart sent the requested letter of confirmation via mail and facsimile. Counsel paid additional fees to change their travel plans in order to fly from Minnesota to Alabama for the sole purpose of making this scheduled appointment.

97.     Shortly before the visit, the Warden's Office informed Mr. Hart's counsel that although it received the letter confirming the visit for October 19, 2000,

33

the appointment was not put into the scheduling book, and the available appointments were all filled for that day.

98.     Mr. Hart's attorneys thus incurred significant financial loss as a result of making travel plans and purchasing airline tickets to effectuate these plans. Additionally, these attorneys had to rearrange their plans to accommodate the prison's schedule, only to have these plans canceled at the last minute.  Mr. Hart suffered a direct injury to his viable postconviction claims as the money and resources which would have been used to investigate and present his claims to the state and federal courts instead were wasted on airfare and extra time in an attempt to accommodate Holman's arbitrary policy, only to have the visit cancelled at the last minute.

99.     Eugene Clemons' attorneys were also subjected to a last minute cancellation of a scheduled appointment by the Holman Warden's Office.  On December 19, 2000, a court granted Mr. Clemons' motion to receive notice ten days prior to the date on which the State scheduled its mental health examination of Mr. Clemons, in order that Mr. Clemons attorneys would have time to prepare their client for the examination.  One of Mr. Clemons' legal claims was that his trial attorneys were ineffective for failing to present mental health evidence at the guilt and penalty phases of his trial.  In order to rebut Mr. Clemons' expert testimony, the State had its own expert conduct an evaluation of Mr. Clemons, and it was crucial that his attorneys be allowed to prepare him for this examination.

34

100.   On February 2, 2001, Mr. Clemons' attorney received notice that the state's examination of Mr. Clemons was scheduled for February 20, 2001.  The attorney, who, as stated previously in this complaint, is representing Mr. Clemons on a *pro bono* basis, called the Holman Warden's Office and scheduled an appointment to meet with Mr. Clemons on February 13, 2001, which was the only appointment available before February 20, 2001.

101.   On Monday, February 5, 2001, the Holman Warden's Office called the attorney and informed her that the February 13, 2001 appointment had been canceled and that there were no other appointments available before February 20, 2001.  The attorney filed an emergency motion with the trial court, and on February 9, 2001 the trial court scheduled a hearing for Tuesday, February 13, 2001.  Approximately two hours after this emergency hearing was set by the court, a state attorney general called Mr. Clemons' attorney to inform her that the Holman Warden's Office had called to inform him that a visitation slot had opened on February 14, 2001.

102.   Holman's arbitrary and unreasonable procedures force death row prisoners to employ extraordinary measures – such as filing emergency motions with courts – in order to see their attorneys.  These practices obstructed Mr. Clemons' efforts to access his attorneys and the courts because they forced his attorneys to waste time and money that could have been used more effectively to investigate and present Mr. Clemons' claims.

35

103.  The incidents alleged in paragraphs 79 through 102 above are representative of the experiences of many death row prisoners in Alabama.

104.  Warden Jones' arbitrary and unreasonable restrictions on the attorneys who are permitted to visit death row prisoners facing strict deadlines and scarce resources, in combination with the other acts of the Defendants alleged in paragraphs 27 through 78 and 105 through 135, are calculated to and do have the effect of thwarting and obstructing the Plaintiffs' access to judicial remedies for the vindication of their constitutional rights.  Such acts further constitute an unconstitutional and unlawful impediment to prisoners' timely pursuit of federal habeas relief.

E.  Holman's Arbitrary and Unreasonable Restrictions on Visits by Non-Attorney Members of Death Row Prisoners' Legal Teams Inhibit the Prisoners' Ability to Investigate and Present Their Postconviction Claims.

105.  In addition to the ad hoc restrictions imposed by Holman prison as to when attorneys may visit death row inmates, Holman prison maintains arbitrary and unreasonable restrictions on visits to death row prisoners by non-attorney members of the legal team.  Death row prisoners who are confined in Alabama prisons rely heavily on these non-lawyers at the postconviction stage when investigation is a critical and necessary part of presenting the case to both the state and federal courts.  Thus, death row prisoners who are denied the opportunity to visit with all members of their legal teams are denied the opportunity to investigate and present valid legal claims to the state and federal habeas courts.

36

106.    Holman's arbitrary policies often completely prohibit visits from non-legal members of a death row prisoner's defense team.  This means that death row prisoners are denied the opportunity to consult with anyone other than their attorney – they are barred from meeting with paralegals, mitigation specialists, investigators or social workers – even when that particular individual will be accompanying the "counsel of record" on the visit.

107.    When death row prisoners are not completely prohibited from visiting with non-legal members of their defense teams, Holman requires that non-legal members of the defense team obtain a court order as a prerequisite to gaining access to their client. This requirement arbitrarily and unreasonably obstructs the prisoners' abilities to prepare and present their viable postconviction claims and denies them their right of access to the courts.

108.    Holman has deprived one death row prisoner of the opportunity of future consultation with his mitigation specialist, who is also an attorney, without a court order.   This prisoner is represented by attorneys at a law firm who have taken his case on a  volunteer basis.

109.    Capital litigation frequently involves the need for mitigation specialists.  The aforementioned prisoner has alleged in his postconviction proceedings that his trial lawyers were ineffective for failing to present available mitigation evidence to the jury during the sentencing phase of his capital trial.  When the mitigation specialist hired by his postconviction attorneys was banned from future visits with the prisoner without a court order, he was unable to

37

investigate and develop his ineffective assistance claims through the use of a mitigation specialist, denied the necessary means to present factual support for those claims, and prejudicially hampered in making his postconviction case to the courts.

110.   Death row prisoner Eugene Clemons has also alleged that his lawyers were ineffective for failing to investigate and present available mitigation evidence at the penalty phase of his trial.  Holman has banned all non-legal members of his defense team and attorneys who are not "counsel of record" from visiting with Mr. Clemons without a court order.  Specifically, Holman prison denied access to Mr. Clemons' mitigation specialist because she did not have a court order, though she had visited Mr. Clemons on a previous occasion.

111.   In order to prepare and present the motions necessary to obtain a court order, death row prisoners must expend the limited time and resources of their postconviction attorneys and undergo delays in the investigation and development of their viable postconviction claims.  These wasteful, unproductive consequences of Defendants' arbitrary and unreasonable ban on visits by mitigation specialists and other defense experts without a court order impede the prisoners' ability to utilize their attorneys and legal defense team members effectively in obtaining meaningful access to the courts.

112.   Even when attorneys do obtain court orders for their expert, Holman prison often prevents these visits from taking place by arbitrarily canceling or denying the visits without notice.

38

113.   Holman denied one death row prisoner access to the courts when his psychological expert was banned from the prison and thus unable to evaluate him. After the expert arrived at the prison with the appropriate court order, Warden Jones ordered him to leave for the day, and the expert was thus unable to conduct his evaluation. Subsequently, the Warden informed this expert that he was banned from the prison altogether, although no explanation for this action was given.

114.   This death row prisoner's attorney expended considerable time and money to bring this expert to Alabama to evaluate the client, an evaluation which was necessary to the case. As a result of this arbitrary and grossly unfair action by the prison, this prisoner was required to expend additional funds to hire another expert, in addition to payment for the time that the first expert spent in traveling to Alabama. This severely burdened this prisoner's access to the courts.

115.   The incidents alleged in paragraphs 105 through 114 above are representative of the experiences of many death row prisoners in Alabama.

116.   Warden Jones' arbitrary and unreasonable restrictions on visits to death row prisoners by non-attorney members of their legal teams, in combination with the other acts of the Defendants alleged in paragraphs 27 through 104 and 117 through 135, are calculated to and do have the effect of thwarting and obstructing the Plaintiffs' access to judicial remedies for the vindication of their constitutional rights. Such acts further constitute an unconstitutional and unlawful impediment to prisoners' timely pursuit of federal habeas relief.

39

F. Holman Affords State Attorneys and Experts Unequal and Unrestricted
Access to Death Row Prisoners.

117.   Death row prisoners' ability to obtain access to the courts for the
effective vindication of their viable postconviction claims is further frustrated by
Holman's policy of allowing the State's experts and attorneys unrestricted and
unequal access to them.

118.   Holman prison routinely affords State experts unlimited time to
conduct evaluations of death row prisoners, the opportunity to inspect their cells on
death row as part of this evaluation and access to their cellmates on death row.
Holman does not require that the State obtain the court's permission in order to
obtain this access. In contrast, experts retained by death row inmates are not
provided the same opportunities and privileges, and are required to obtain a court
order in order to (1) extend the length of time of the visit beyond normal visiting
hours, (2) conduct an inspection of the cell, (3) review records, and (4) talk with any
other death row prisoners.

119.   Death row prisoner James Callahan's right of access to the courts was
impeded by the unequal and unrestricted access afforded the state attorneys and
experts during his state postconviction proceedings in 1997.  In his state
postconviction petition, Mr. Callahan asserted that he had been denied effective
assistance of counsel at both the guilt and penalty phases of his trial.  In support of
these allegations, he attempted to present the testimony of a mental health expert.
In order to rebut his testimony, the state employed its own expert, Dr. Karl

Kirkland, to examine Mr. Callahan prior to his state postconviction hearing. Holman afforded the state's expert a number of opportunities that were not provided to defense counsel's expert.

120.  Initially, Holman allowed Dr. Kirkland to examine Mr. Callahan in a conference room adjacent to the Warden's Office and Mr. Callahan was not handcuffed during this visit.  Holman also permitted the state's expert the opportunity to speak with Mr. Callahan's cellmates and the Assistant Warden to obtain information about Mr. Callahan.  Further, the Holman Warden allowed the state's expert to review Mr. Callahan's death row cell as part of his evaluation. Holman did not require the state to produce a court order in order to interview these individuals or to review Mr. Callahan's cell.

121.  In contrast, Holman confined Mr. Callahan's expert to the visiting yard, prevented him from talking to any other death row prisoners, and did not allow him the opportunity to examine Mr. Callahan's cell as part of the evaluation. In addition, Mr. Callahan's expert was forced to return to Holman on two separate occasions in order to complete his testing.  On the first visit, Holman would not permit Mr. Callahan to be unshackled during his evaluation by the expert unless an armed guard was present in the room.  In order for the expert to complete his evaluation, he needed to perform a standard battery of tests that required that Mr. Callahan use his hands and also required that the confidentiality of the testing environment be secure.  Despite the fact that this expert informed Holman prison of this, Holman officials refused to allow the testing to continue.  Thus, Mr. Callahan's

41

attorney was forced to obtain an order from the circuit court forcing Holman to allow this expert to evaluate Mr. Callahan without handcuffs or the presence of a guard. As a result, this expert was forced to make two separate trips to Holman prison to complete tests that could have been completed in one day.

122.   In this case, Mr. Callahan was forced to expend additional time and resources to obtain a court order for his expert to visit a second time, and to pay for this expert to cancel yet another day of work so that he could make the five-hour drive from Tuscaloosa to Holman prison. These added expenses further depleted Mr. Callahan's resources, and concomitantly deprived him of meaningful access to the courts.

123.   Holman prison officials have afforded the State's experts and attorneys unrestricted and unequal access to several other death row prisoners. This unequal treatment unconstitutionally impedes death row prisoners' ability to seek and receive the assistance of counsel and effectively present their claims to state and federal courts.

124.   The incidents alleged in paragraphs 117 through 123 above are representative of the experiences of many death row prisoners in Alabama.

125.   Warden Jones' unequal application of Holman's unreasonably restrictive visiting policies, in combination with the other acts of the Defendants alleged in paragraphs 27 through 116 and 126 through 135, are calculated to and do have the effect of thwarting and obstructing the Plaintiffs' access to judicial remedies for the vindication of their constitutional rights. Such acts further

42

constitute an unconstitutional and unlawful impediment to prisoners' timely pursuit of federal habeas relief.

G. Holman's Mistreatment of Death Row Prisoners' Attorneys Interferes with the Prisoners' Ability to Obtain Meaningful Access to the Courts to Pursue Their Postconviction Claims.

126.    In addition to imposing arbitrary and unreasonable restrictions on death row prisoners' ability to gain access to their attorneys, Holman Warden Charlie Jones and his staff mistreat both prisoners and their attorneys and thus further hinder prisoners' ability to obtain meaningful legal assistance.  This unjustified and oppressive behavior has the effect of discouraging legal efforts that would otherwise be made on behalf of death row prisoners in Alabama.

127.    On several occasions, Warden Jones has engaged in verbal assaults and threats to attorneys who try to arrange visits with their clients on death row. Similarly, Warden Jones has accused other attorneys of lying or playing games when they have tried to set up visits to see their clients, or schedule appointments for their experts.

128.    The Warden's unprovoked assaults not only wasted the attorneys' valuable time and money, both of which might have been used more efficaciously in working on their clients' cases, but further deterred their efforts to be effective advocates for their clients.

129.    The Warden and his staff also infringe on private conversations that occur between attorneys and their clients during visits.  The only available visiting area contains windows on all four sides, and is surrounded by hallways where

43

guards, other inmates, and the Warden regularly travel. This behavior on the part of prison staff undermines the ability of a secure and confidential relationship between attorney and client, and effectively diminishes death row prisoners' ability to access the courts.

130.   This mistreatment is not limited to attorneys, but extends to non-attorney staff and prisoners as well. Non-attorneys who are involved in clemency proceedings have also been subjected to verbal attacks by Warden Jones. On at least one occasion Warden Jones berated a mitigation specialist assisting in clemency proceedings by shouting at her that she did not belong at the prison and she was not qualified to work on the case.

131.   The incidents alleged in paragraphs 132 through 134 above are representative of the experiences of many death row prisoners in Alabama.

132.   Warden Jones' arbitrary and unreasonable mistreatment of death row prisoners' attorneys, in combination with the other acts of the Defendants alleged in paragraphs 27 through 125 and 132 through 135, are calculated to and do have the effect of thwarting and obstructing the Plaintiffs' access to judicial remedies for the vindication of their constitutional rights. Such acts further constitute an unconstitutional and unlawful impediment to prisoners' timely pursuit of federal habeas relief.

H. <u>The Defendants' Arbitrary and Unreasonable Conduct has Prevented Death Row Prisoners from Obtaining Legal Assistance in Pursuing Postconviction Relief</u>.

133.    The various and cumulative barriers Defendants have erected to death row prisoners' meaningful access to the courts directly impair the prisoners' ability to find and recruit the services of counsel to represent them in postconviction proceedings.   As alleged above, the prisoners' attorneys are representing them primarily, if not entirely, on a *pro bono* basis.  The arbitrary, unpredictable, and unreasonable restrictions imposed by Defendants, which stretch the already limited resources of *pro bono* counsel and prevent them from adopting effective cost-saving measures such as using paralegals where possible, act to deter lawyers from volunteering to represent death row prisoners in Alabama.  This deterrent effect, in combination with the growing ranks of the death row population, renders it exceedingly difficult for indigent death row prisoners to find and recruit the services of counsel.

134.    Plaintiff Tony Barksdale has been without counsel since his direct appeal ended on May 29, 2001.  He will be permanently barred from federal review unless counsel is made available to him sufficiently in advance of May 29, 2002, to allow preparation of his postconviction petition.  He and other unrepresented death row inmates are consistently deprived of the ability to seek and obtain effective assistance of counsel as a result of the arbitrary and capricious restrictions imposed by Defendants, and are thereby denied their rights of access to the courts.

45

135.    Plaintiff Anthony Tyson has been without counsel since his direct appeal ended on May 21, 2001.  He will be permanently barred from state and federal review unless counsel is made available to him sufficiently in advance of May 21, 2002, to allow preparation of his postconviction petition.  In order to prevent Mr. Tyson from missing his filing deadline, two paralegals were recruited to initiate an investigation into Mr. Tyson's case. Over a three month period, these paralegals were able to spend less than five total hours with Mr. Tyson as a result of Holman's restrictive visiting policies.  None of the three visits permitted by the prison was over two hours in length.  In addition to impinging on Mr. Tyson's ability to investigate and present his legal claims, Holman's restrictive visitation policies have deterred the recruitment of lawyers who are unable to shoulder the additional cost of representing him in post-conviction and federal habeas proceedings. The arbitrary and capricious restrictions imposed by Defendants deprive Mr. Tyson of the ability to seek and obtain effective assistance of counsel and thereby deny him his rights of access to the courts.

136.    The incidents alleged in paragraphs 132 through 134 above are representative of the experiences of many death row prisoners in Alabama.

III.    Plaintiffs Have Exhausted All Available Administrative Remedies.

137.    Plaintiffs have exhausted such administrative remedies as are available to redress the constitutional violations alleged in this complaint.

138.    Attorneys for death row inmates have repeatedly complained about the restrictive prison policies for death row visits.  Problems created by these policies

46

have repeatedly been brought to the attention of prison officials, including the Department of Corrections and the wardens of each prison.

139.   Neither Holman nor Donaldson has a grievance procedure for non-medical grievances.  Nonetheless, over the past two years, in an attempt to alleviate the burden imposed upon death row inmates by the prisons' restrictive visitation policies, representatives of death row prisoners have sought relief from both Holman Warden Charlie Jones and Donaldson Warden Billy Mitchem.  In a further attempt to gain access to death row inmates, requests for new procedures were also made to legal counsel for the Department of Corrections and the State Attorney General's office.  No change in policy resulted from these initiatives.

140.   Inmates at Holman prison have also met with prison officials in an attempt to address the problems created by the restrictions alleged in this complaint.  Although less restrictive visits were promised, requests for improved attorney access to death row prisoners were subsequently denied.

## CAUSES OF ACTION

### Count One

141.   Defendants' failure to provide any mechanism for ensuring that Plaintiffs have access to the assistance of counsel for the preparation of their state postconviction petitions, in combination with Defendants' active interference with Plaintiffs' efforts to access their legal teams throughout the collateral review process, has violated and continues to violate Plaintiffs' constitutional rights to

47

meaningful access to the courts in violation of Plaintiffs' rights under the First, Sixth, and Fourteenth Amendments to the United States Constitution.

## Count Two

142.    Defendants' policy, pattern, and practice of arbitrary and capricious interference with Plaintiffs' efforts to gain access to legal assistance during the collateral review process will result in the imposition of death in an arbitrary and capricious manner.  The Defendant's actions, as detailed in paragraphs __ through __ above, have prevented and continue to prevent Plaintiffs and the class they represent from pursuing their legal remedies in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

## Count Three

143.    Defendants' unconstitutional actions violate Plaintiffs' federal statutory and constitutional rights to counsel.

## REMEDIES

I.    Defendants' Actions Constitute an Unlawful or Unconstitutional Impediment to Plaintiffs' Filing Timely Applications for Federal Habeas Corpus Such That the Federal Statute of Limitations Has Not Yet Begun to Run.

144.    Defendants' actions, detailed in paragraphs 1through 143, above, mandate the remedy of a declaratory judgment and order that the statute of limitations for filing Plaintiffs' applications for federal habeas corpus has not yet begun to run and shall not begin to run until Defendants have corrected the impediment created by their unconstitutional actions.

145.    The various and cumulative barriers Defendants have erected to Plaintiffs' ability to obtain meaningful access to the courts in collateral proceedings for the vindication of their viable federal constitutional challenges to their convictions and/or sentences constitute an unlawful or unconstitutional impediment, within the meaning of 28 U.S.C. § 2244(b)(1)(D), to the timely filing of Plaintiffs' federal habeas petitions.  Plaintiffs have diligently pursued their federal claims but have been prevented from doing so as a result of Defendants' unconstitutional actions.

146.    Accordingly, Plaintiffs seek a declaratory judgment that, pursuant to 28 U.S.C. § 2244(d)(1)(B), the one-year federal habeas statute of limitations in each Plaintiff's case has not yet begun to run as a result of the unlawful or unconstitutional impediment created by Defendants.  Plaintiffs further seek a declaratory judgment and order that the limitations period for filing a federal habeas petition in each Plaintiff's case shall run from the date on which Defendants' reform their policies and practices so as to remove the impediment and satisfy constitutional requirements.

II.    <u>Defendants' Actions Mandate Equitable Tolling of Applicable Statutes of Limitations as Applied to Plaintiffs' Federal Habeas Petitions.</u>

147.    Defendants' actions, detailed in paragraphs 1 through 143, above, mandate the remedy of equitable tolling of the statute of limitations for filing of Plaintiffs' federal habeas petitions.

148.   The various and cumulative barriers Defendants have erected to Plaintiffs' ability to obtain meaningful access to the courts in collateral proceedings for the vindication of their viable federal constitutional challenges to their convictions and/or sentences constitute an extraordinary circumstance that is clearly beyond Plaintiffs' control and is unavoidable even with the exercise of due diligence by the Plaintiffs.  Plaintiffs exercise no control over Defendants' arbitrary decisions to bar, restrict or interrupt visits between Plaintiffs and counsel, non-attorney assistants, and experts.  To the extent possible, Plaintiffs have conscientiously complied with Defendants' ever-changing and inconsistent visitation restrictions.

149.   It would be unconscionable to enforce the limitation period against Plaintiffs and gross injustice would result.  If the limitation period is not tolled in Plaintiffs' cases, Plaintiffs will be denied federal review of their colorable constitutional claims.  The consequences of error in Plaintiffs' capital cases are terminal.  Because the consequences are so grave and Plaintiffs have exercised reasonable diligence, the extraordinary circumstances present in this case warrant equitable tolling.  The principles of equity render unfair any rigid application of the limitation period to Plaintiffs under the circumstances detailed herein.

## PRAYER FOR RELIEF

On the basis of the foregoing, Plaintiffs and the class they represent respectfully request that this Court do the following:

(a)     Order that this action be maintained as a class action pursuant to Fed. R. Civ. P. 23 (b)(2) with respect to the class identified herein;

(b)     Declare that the policies, practices, acts and omissions of the Defendants described in this complaint are in violations of Plaintiffs' rights of access to counsel and the courts, to effective assistance of counsel and to due process of law as guaranteed by the First, Sixth, Eighth and Fourteenth Amendments to the United States Constitution;

(c)     Permanently enjoin Defendants, their officers, agents, employees and successors in office, as well as those acting in concert and participating with them from subjecting Plaintiffs and the class they represent to the illegal and unconstitutional practices described in this complaint;

(d)     Order Defendants to implement reasonable visitation policies and other measures to enable Plaintiffs and the class they represent to have meaningful access to the courts for the vindication of their postconviction claims;

(e)     Declare that the one-year statute of limitations for filing federal habeas petitions pursuant to 28 U.S.C. § 2244(d)(1)(B) in each Plaintiff's case has not yet begun to run as a result of the unconstitutional or unlawful impediment created by Defendants' actions described herein and further declare and order that the limitations period for filing a federal habeas petition in each Plaintiff's case shall run from the date on which Defendants reform their policies and practices so as to remove the impediment and satisfy constitutional requirements;

(f)     Equitably toll the running of the federal statute of limitations;

51

(g)     Award Plaintiffs their reasonable costs and attorney's fees pursuant to

42 U.S.C. § 1988;

(h)     Retain jurisdiction of this matter until the unlawful and

unconstitutional conditions and practices alleged herein no longer exist and the

Court is satisfied that they will not recur;  and

(i)     Grant such other relief as may be just and equitable.

Respectfully Submitted,

BRYAN A. STEVENSON (STE077)
Equal Justice Initiative of Alabama
643 South Perry Street
Montgomery, AL  36104
(334)-269-1803

STEPHEN P. HANLON
Holland & Knight LLP
315 S. Calhoun Street
Suite 600
Tallahassee, FL 32301
(850) 224-7000
Florida Bar #209430

H. ESME BASHWINER
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700
California Bar #203339

*Counsel for Plaintiffs*

DATED:  December 28, 2001

52