IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CHRISTOPHER BARBOUR, *et al.*,    )
                                  )
            Plaintiffs,           )
                                  )
v.                                )        CIVIL ACTION NO.  2:01cv1530-C
                                  )                   WO
MICHAEL HALEY, *et al.*,          )
                                  )
            Defendants.           )

## MEMORANDUM OPINION[1]

## IA.  INTRODUCTION

Perhaps no characteristic of an organized and cohesive society is more
fundamental than its erection and enforcement of a system of rules defining
the various rights and duties of its members, enabling them to govern their
affairs and definitively settle their differences in an orderly, predictable
manner. Without such a "legal system," social organization and cohesion are
virtually impossible .... Put more succinctly, it is this injection of the rule of
law that allows society to reap the benefits of rejecting what political
theorists call the "state of nature."

*Boddie v. Connecticut*,  401 U.S. 371, 374 (1971).[2]

In *Boddie*, Justice Harlan eloquently links the rule of law to the right of access to

the courts.[3]  The fundamental issue raised in this 42 U.S.C. § 1983  case is the extent of

---

[1]Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties consented and the case was referred on April 3, 2002 to the United States Magistrate Judge for conducting all proceedings and ordering the entry of final judgment.

[2]Indeed, the ability to obtain civil redress was characterized by Chief Justice John Marshal as the "very essence of civil liberty." *Marbury v. Madison*, . 5 U.S. (1 Cranch) 137, 163 (1803).

[3]"The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government." *Chambers v. Baltimore & Ohio R.R. Co.*, 207 U.S. 142, 148 (1907).

the responsibility of a state in insuring that right by helping inmates sentenced to death to advance their collateral claims in state court.  This case is not about the death penalty and the continuing debate which swarms about that criminal penalty.  It is however about what the Constitution requires of states[4] which provide postconviction remedies to death row inmates.  The court has jurisdiction over the claims of the plaintiff class pursuant to 28 U.S.C. § 1331.

The original complaint in this case including claims that state prison officials were violating the rights of death row inmates by creating impediments to their right of access to counsel.[5]  As reflected in other opinions entered in this case, the parties initially devoted their time and energies to amicably resolving these issues, and they were successful in this endeavor.  That left what is in essence a single claim: the failure of the state to provide counsel or some form of adequate legal assistance to death row inmates prior to filing in state court their postconviction challenges to their convictions and sentences of death deprives them of their constitutional right of access to the courts.

At the outset, one undisputed fact is clear.  In some instances, counsel are

---

[4]The four defendants are all state officials named only in their official capacities: the Governor of the State of Alabama, the Commissioner of the Alabama Department of Corrections, and the wardens of the two institutions where the plaintiff class members are incarcerated.

[5]ALA. CODE § 15-9-38 addresses access to counsel and "gives a person . . . the right to be represented by legal counsel in a habeas corpus proceeding. This statute does not, however, expressly require that such person be represented by court-appointed counsel if he is unable to employ counsel." *See Sullivan v. State*, 181 So. 2d 518, 520 (Ala. Ct. App. 1965) (interpreting Ala. Code § 15-57 (1965) which is now § 15-9-38).

appointed by Alabama to death row inmates to assist them in pursuing postconviction

claims.  The Alabama Supreme Court recently explained the process.

> The Alabama Rules of Criminal Procedure permit a trial court to appoint counsel to represent an indigent petitioner in a postconviction proceeding if it "appears that counsel is necessary to assert or protect the rights of the petitioner." Rule 32.7(c), ALA. R.CRIM. P. *Such an appointment occurs only after a petition has been filed.* Therefore, inmates who are unable to find counsel to represent them before the limitations period for filing a Rule 32 petition expires, including inmates who are mentally ill, illiterate, or mentally retarded, must determine the date by which they must file their Rule 32 petition and prepare and file a petition in the proper form with the proper claims in the proper court. In 2002, this Court amended Rule 32, ALA. R.CRIM. P., to reduce the limitations period for filing a Rule 32 petition from two years to one year. Because most Rule 32 petitioners are imprisoned, those petitions are often based on a preliminary and restricted investigation of the claims asserted. Furthermore, an incarcerated inmate who does not have legal counsel is obviously hampered in his or her ability to interview witnesses, to gather records, to investigate factual questions, and to conduct legal research. A strict application of the doctrine of relation back to prohibit reasonable amendments to Rule 32 petitions could exacerbate these problems.

*Ex parte Jenkins*, – So.2d –, –, 2005 WL 796809, *5 (Ala. April 8, 2005) (emphasis

added) (Holding that the civil relation back doctrine shall not apply to amendments of a

postconviction petition).[6]

The plaintiff class contends nonetheless that the State's failure to appoint counsel

for a death row inmate *prior* to the inmate's filing a postconviction petition deprives the

---

[6]The plaintiff class suggests that the decision to appoint counsel rests more in the hands of the Attorney General than the State's trial judges.  "State postconviction judges do have discretion to appoint counsel *after* a *pro se* Rule 32 petition has survived the judge's initial scrutiny, but in practice lawyers tend to be appointed only when the Assistant Attorney General assigned to a case decided that it is in the State's best interest to litigate against a represented inmate rather than an unrepresented one and therefore asks the judge to give the inmate a lawyer."  Plts' Brf. Opp. defendant's Motion For Summary Judgment at 11.

inmate of the right of access because timely assistance of counsel is necessary for

"meaningful" access for persons in their unique situation.  Alternatively, the plaintiff class

contends that because of their unique situation they have a right at least to some form of

legal assistance prior to filing their petitions.  Hearkening back to Justice Kennedy's

concurrence in  *Murray v. Giarratano*, 492 U.S. 1 (1989), the plaintiffs argue that the

complex procedural and factual demands of Alabama's postconviction process which they

characterize as "a parody of process and a travesty of justice," cannot be met without legal

assistance from outside the prison walls.

> Alabama postconviction procedure . . .  is marked by strict pleading
> requirements, inflexible filing deadlines, elaborate preclusion doctrines, and
> other technical pitfalls that cannot practicably be navigated without
> competent counsel.  The Alabama Attorney General's Office routinely files
> motion to dismiss claims in petitions filed *pro se* by death-row prisoners on
> procedural grounds such as lack of specificity . . .  failure to state a claim
> upon which relief may be granted . . .  and/or to dismiss claims as
> procedurally barred . . .  Alabama judges have adopted the Attorney
> General's interpretation of the pleading requirements of Rule 32,[7] under
> which petitioners must set out specific factual details that cannot be obtained
> unaided from Death Row.  Lacking the ability to interview witnesses, gather
> records, or investigate factual questions before filing – let alone the legal
> skill to understand what form of allegations will make a pleading
> "sufficiently specific" . . .  prisoners are at risk of summary dismissal.

Plts' Brf. Opp. defendant's Motion For Summary Judgment at 30-31.

In support of their constitutional claim, the plaintiffs posit three legal theories:

1.  The Sixth Amendment guarantee of Assistance of Counsel, as well as the Eighth

Amendment prohibition against Cruel and Unusual Punishment and the Fourteenth

---

[7]ALA. R. CRIM. P. 32 is the State's postconviction procedure rule.

4

Amendment command of Due Process, give indigent death-sentenced inmates a federal
constitutional right to counsel which requires the State of Alabama to provide attorneys to
represent them in preparing and presenting Rule 32 proceedings that challenge their
convictions or sentences.[8]

2.  Under Alabama's current death-row conditions and postconviction practices, the
Fourteenth Amendment right of access to the courts requires the State to provide attorneys
to represent condemned inmates in preparing and presenting Rule 32 proceedings
challenging their convictions or sentences.

3.  Under Alabama's current death-row conditions and postconviction practices, the
Fourteenth Amendment right of access to the courts requires the State to provide some
other form of legal assistance or relief from Rule 32's impediments that is sufficient to
enable them to obtain meaningful judicial consideration of potentially meritorious
challenges to their convictions or sentences.[9]

## IB.  Procedural History

The complaint in this § 1983 action was filed on December 28, 2001.  In addition
to the claims explicated above, the plaintiffs also advanced a number of complaints about

---

[8]In further support of this claim, the plaintiffs argue that the plurality opinion in *Murray v. Giarratano*, 492 U.S. 1 (1989), "purporting to reject this position did not speak for a majority of the Court and is thus not dispositive of the issues" and "[a]lternatively, Alabama's current death-row conditions and postconviction practices differ sufficiently from those in Virginia in 1989 so that *Giarratano* would be distinguishable . . ." Plts' Brf. Opp. defendant's Motion For Summary Judgment at 18.

[9]In this regard, the plaintiffs argue that if any of these theories are correct, Alabama's Rule 32 process itself must be viewed as an external impediment sufficient to toll the running of the statute of limitation established in 28 U.S.C. § 2244(d)(1).

various actions of the defendants which impeded the plaintiffs' access to lawyers,[10] legal assistants such as paralegals, and experts such as psychologists or social workers. After some preliminary skirmishes,[11] the defendants answered and filed two days later a motion to dismiss for want of jurisdiction. In this same time period, the plaintiffs filed their motion for class certification and a motion for preliminary injunctive relief.

In an opinion entered March 24, 2003, the court resolved the jurisdictional motion by dismissing count two[12] of the plaintiffs complaint on jurisdictional grounds and denying the motion in all other respects. In a separate order, the court denied without prejudice a number of pending preliminary injunctive motions and stayed further proceedings on the issues relating to claims of denial of access by lawyers to their death row clients. The underlying basis for that order was the willingness of the parties to amicably resolve these claims. In January 2004, the court entered an order which stated in part as follows:

> The parties are commended for working together to reach an

---

[10]In some instances the plaintiffs had little or very limited access to their counsel, or in some instances had no access to lawyers who desired to meet with the plaintiffs to determine whether to represent them.

[11]The defendants' initial response to the complaint was a motion to transfer venue to the United States District Court for the Southern District of Alabama primarily because the majority of the death row inmates resided in that district. That motion was denied. Before filing an answer, the defendants filed a motion to dismiss which was denied.

[12]Count two asserted a Sixth Amendment right of access to counsel during collateral review proceedings. In dismissing this count on jurisdictional grounds, the court concluded that the plaintiffs lacked standing to assert a claim which as a matter of law plainly did not exist on the basis of *Murray v. Giarrantano*, 492 U.S. 1 (1989) and *Pennsylvania v. Finley*, 481 U.S. 551 (1987).

6

amicable resolution of the difficult issues.  Through cooperation and diligence, the parties were able to resolve the claims related to access by lawyers to death row inmates, as well as reduce animosities between the parties and pave the way for the cooperation that led to the expeditious result in this litigation.  The court appreciates the tenacity, diligence and hard work on the part of the litigants and their counsel that has led to the resolution of this aspect of the litigation.

Several months later in 2004, the plaintiffs renewed their motion for final judgment on the remaining claims and also filed a motion requesting the court to "toll the running of the Federal Statute of Limitations."  This latter motion argued that the failure of the defendants to provide counsel to death row inmates to assist with the investigation of claims and the filing of state collateral proceedings constituted an "impediment" within the meaning of 28 U.S.C. § 2244(d)(1)(B).[13]

---

[13]28 U.S.C. § 44(d) establishes a one-year statute of limitations for the filing of federal post-conviction proceedings:

(d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period

On April 26, 2005, the court granted the plaintiffs' motion for class certification.  The court has certified[14] a class consisting of all persons (1) who have been, are or will be in state custody, (2) who are under a sentence of death, (3) who are unable to afford counsel and have been, are or will be unrepresented by counsel in connection with the investigation, initiation or prosecution of state postconviction remedies , (4) whose convictions have become final under state law, (5) who have not completed the postconviction, collateral review process provided under the laws of Alabama, and (6) for whom the State refuses to provide counsel for the investigation, initiation and prosecution of state postconviction remedies.

## II.  The Evolution of Access Claims

More than wenty years ago, the Eleventh Circuit concluded that the constitutional right of access to courts does not require states to provide counsel to inmates to pursue collateral attacks on their convictions.  *Hooks v. Wainwright*, 775 F.2d 1433 (11th Cir. 1985).  "Although it may take more decisions to ascertain exactly what the Supreme Court will decide is constitutionally required to assure 'meaningful access,' we know from the *Bounds* holding that the Supreme Court does not presently interpret those words to require the mandatory provision of legal services."  *Hooks* at 1435.  This opinion is binding on this court unless an intervening *en banc* Eleventh Circuit decision or a decision of the

---

of limitation under this subsection.

[14]An order certifying a class may always be modified prior to final judgment.  FED.R.CIV.P. 23(c)(1)(C).  By separate order, the court has amended the class definition after considering the views of the parties.  The class definition set forth here is the amended definition.

Supreme Court has changed the law.   *Hooks* was based on the Eleventh Circuit's analysis

of the Supreme Court's access decision in *Bounds v. Smith*, 430 U.S. 817 (1977), and its

canvas of the existing cases at the time.  In the twenty years since *Hooks* much has

happened in the area and tracing that evolution is necessary because there is no one source

of the right of access to which a court may look.  Rather, the right of access is multifaceted

and dependent on various constitutional formulations.  "Access to the courts is clearly a

constitutional right, grounded in the First Amendment, the Article IV Privileges and

Immunities Clause, the Fifth Amendment, and/or the Fourteenth Amendment." *Chappell*

*v. Rich*, 340 F.3d 1279, 1282 (11th Cir.2003), *cert. denied*, 540 U.S. 1219 (2004).  Given

this multi-parental lineage, the court undertakes a review of the salient cases about the

right.

In *Ex parte Hull*, 312 U.S. 546 (1941) the Court held unconstitutional a prison

regulation that authorized a legal investigator for the parole board to intercept prisoner

habeas corpus petitions that were thought by the investigator to be improperly drawn.

> [T]he state and its officers may not abridge or impair petitioner's right to
> apply to a federal court for a writ of habeas corpus. Whether a petition for
> writ of habeas corpus addressed to a federal court is properly drawn and
> what allegations it must contain are questions for that court alone to
> determine.

*Id.* at 549 .

In *Smith v. Bennett*, 365 U.S. 708 (1961), the Court held that a state's refusal to

docket habeas corpus petitions without the payment of a filing fee denied equal protection

9

to indigent prisoners. "[To interpose any financial consideration between an indigent prisoner of the State and his exercise of a state right to sue for his liberty is to deny that prisoner the equal protection of the laws." *Id.* at 709.[15]  In *Johnson v. Avery*, 393 U.S. 483 (1969), the Court held unconstitutional a prison regulation prohibiting inmates from helping each other prepare habeas petitions.

In *Hull*, *Bennett* and *Avery*, the focus of the court was on protection of the right of an inmate to file a petition for habeas corpus.  The Court did not identify the constitutional source of the protections it announced.  Then, in *Procunier v. Martinez*, 416 U.S. 396 (1974), *overruled on other grounds*, *Thornburg v. Abbott*, 490 U.S. 401 (1989), the court held that the Due Process Clause invalidated a prison ban on law student or paralegal interviews with prisoners.  Shortly thereafter, in *Wolff v. McDonnell*, 18 U.S. 539 (1974), the Court extended *Avery* to civil rights actions and declared that *Avery* was based on the Due Process Clause.

> The right of access to the courts, upon which *Avery* was premised, is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights. It is futile to contend that the Civil Rights Act of 1871 has less importance in our constitutional scheme than

---

[15]In reaching this conclusion, the Court refused to draw a distinction between its similar holdings in criminal cases, *see Burns v. Ohio*, 360 U.S. 252 (1959) (appellate filing fee); *Griffin v. Illinois*, 351 U.S. 12 (1956) (transcript), and civil cases such as the habeas case before it.  *Smith v. Bennett*, 365 U.S. 708 (1961).  *Smith* was not the last case dealing with civil filing fees.  *See Boddie v.  Connecticut*, 401 U.S. 371 (1971) (filing fee in divorce actions).  However, not all challenges have been successful. *Ortwein v. Schwab*, 410 U.S. 656 (1973) (per curium) (Filing fee for judicial appeals from adverse administrative welfare determinations permissible); *United States v. Kras*, 409 U.S. 434 (1973) (*Boddie* not extended to filing fees for bankruptcy).

does the Great Writ. The recognition by this Court that prisoners have
certain constitutional rights which can be protected by civil rights actions
would be diluted if inmates, often "totally or functionally illiterate," were
unable to articulate their complaints to the courts.

*Wolff v. McDonnell,* 418 U.S. 539, 579 (1974).

Three years later in *Bounds v. Smith*, 430 U.S. 817, 821-28 (1977) (plurality

opinion), the Supreme Court held that a state must give prisoners a "reasonably adequate

opportunity to present claimed violations of fundamental constitutional rights to the

courts" by providing some form of legal assistance. *Id.* at 825.  "[T]he fundamental

constitutional right of access to the courts requires prison authorities to assist inmates in

the preparation and filing of meaningful legal papers by providing prisoners with adequate

law libraries or adequate assistance from persons trained in the law." *Bounds*, 430 U.S. at

828.

Interestingly, *Bounds'* seemingly expansive declaration of an affirmative obligation

to provide legal assistance for prisoners desiring to file papers in court stands in sharp

contrast with the Court's Sixth Amendment right to counsel cases during the same decade.

In 1963, the court held for the first time that the Fourteenth Amendment made the Sixth

Amendment applicable to the states and that criminal defendants had a fundamental right

to counsel in criminal trials.  *Gideon v. Wainwright*, 372 U.S. 335, 339-41 (1963).  The

Court also held that the right to counsel applied to first appeals as of right.  *Douglas v.*

*California*, 372 U.S. 353, 356 (1963).[16]

But while expanding the right of access for prisoners during the 70s, the Court reined in the scope of the right to counsel in criminal cases. In *Ross v. Moffitt*, 417 U.S. 600 (1974) the Court refused to extend *Douglas* to require that North Carolina provide counsel for discretionary appeals on direct review in state court. *Id.* at 616. Following its approach in *Douglas,* the *Moffitt* court analyzed whether "meaningful access to the appellate system." required counsel, *id.* at 611, and concluded it did not due to the nature of the discretionary review process.

> We do not believe that it can be said, therefore, that a defendant in respondent's circumstances is denied meaningful access to the North Carolina Supreme Court simply because the State does not appoint counsel to aid him in seeking review in that court. At that stage he will have, at the very least, a transcript or other record of trial proceedings, a brief on his behalf in the Court of Appeals setting forth his claims of error, and in many cases an opinion by the Court of Appeals disposing of his case. These materials, supplemented by whatever submission respondent may make pro se, would appear to provide the Supreme Court of North Carolina with an adequate basis for its decision to grant or deny review.

*Moffitt*, 417 U.S. at 615.

According to *Moffitt*, neither fundamental fairness nor equal protection obligates a state to provide counsel for a discretionary appeal; rather, the Constitution is satisfied by "an adequate opportunity to present . . . claims fairly in the context of the . . . appellate

---

[16] *Douglas v. California*, 372 U.S. 353, 356 (1963), is based on the Fourteenth Amendment's Due Process and Equal Protections Clauses rather that the Sixth Amendment. "[T]here can be no equal justice where the kind of appeal a man enjoys 'depends on the amount of money he has . . .' " *Douglas*, 372 U.S. at 355 (quoting *Griffin v. Illinois*, 351 U.S. 12, 19 (1956) (plurality opinion)).

process." *Id.* at 616. "This is not to say, of course, that a skilled lawyer, particularly one trained in the somewhat arcane art of preparing petitions for discretionary review, would not prove helpful to any litigant able to employ him. . . . [But] the fact that a particular service might be of benefit to an indigent defendant does not mean that the service is constitutionally required." *Id.*

In *Pennsylvania v. Finley*, 481 U.S. 551 (1987), the Court concluded that its analysis in *Ross v. Moffitt* foreclosed the claim that a postconviction petitioner is entitled to the procedures set forth in *Anders v. California*, 386 U.S. 738 (1967).[17]   *Id.* at 556. The court also addressed what it describes in *Finley* as an equal protection guarantee of "meaningful access."

> Nor was the equal protection guarantee of "meaningful access" violated in this case. By the time respondent presented her application for postconviction relief, she had been represented at trial and in the Supreme Court of Pennsylvania. In *Ross*, we concluded that the defendant's access to the trial record and the appellate briefs and opinions provided sufficient tools for the pro se litigant to gain meaningful access to courts that possess a discretionary power of review. . . . We think that the same conclusion necessarily obtains with respect to postconviction review. Since respondent has no underlying constitutional right to appointed counsel in state postconviction proceedings, she has no constitutional right to insist on the Anders procedures which were designed solely to protect that underlying constitutional right.

---

[17]In *Anders v. California*, 386 U.S. 738 (1967), the Court held that when an attorney appointed to represent an indigent defendant on direct appeal finds a case wholly frivolous he should move to withdraw but accompany that request with a brief making reference in the record to anything which arguably might support an appeal. "A copy of counsel's brief should be furnished the indigent and time allowed him to raise any points that he chooses; the court--not counsel--then proceeds, after a full examination of all the proceedings, to decide whether the case is wholly frivolous." *Id.* 744.

*Id.* at 557.

For a brief period of time the plurality decision in *Murray v. Giarratano*, 492 U.S.

1 (1989), held out some hope that the court would change direction.  Even though the

court concluded in *Murray* that neither the Eighth Amendment nor the Due Process Clause

requires states to appoint counsel for indigent death row inmates seeking state

postconviction relief, Justice Kennedy's concurrence reflected back on the *Bounds'* notion

that providing a lawyer is one means of satisfying the requirement of "meaningful access."

> The complexity of our jurisprudence in this area, moreover, makes it
> unlikely that capital defendants will be able to file successful petitions for
> collateral relief without the assistance of persons learned in the law.
>
>         The requirement of meaningful access can be satisfied in various
> ways, however. This was made explicit in our decision in *Bounds v. Smith*,
> 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). The intricacies and
> range of options are of sufficient complexity that state legislatures and
> prison administrators must be given "wide discretion" to select appropriate
> solutions. *Id.*, at 833, 97 S.Ct., at 1500. Indeed, judicial imposition of a
> categorical remedy such as that adopted by the court below might pretermit
> other responsible solutions being considered in Congress and state
> legislatures.

492 U.S. at 14.

But a brief two years later, in *Coleman v. Thompson*, 501 U.S. 722 (1991), a

majority of the Court flatly concluded that "*Finley* and *Giarratano* established that there is

no right to counsel in state collateral proceedings."  *Id.* at 755.  The one question left

unanswered in *Coleman* whether the Court potentially would recognize "an exception to

the rule of *Finley* and *Giarratano* in those cases where state collateral review is the first

place a prisoner can present a challenge to his conviction." *Id.*  But in this Circuit, that

exception has no potential.[18]

> Thus, the possible exception to *Finley* and *Giarratano* the Supreme Court
> noted in *Coleman* simply does not exist in this circuit: a petitioner may not
> rely on his collateral counsel's ineffectiveness to excuse the procedural
> default of a claim even when the state collateral proceeding was the
> petitioner's first opportunity to raise the claim. . . .  To recognize such error
> as cause, we would have to find a petitioner has a constitutional right to
> counsel in collateral proceedings. *Finley* and *Giarratano* hold otherwise;
> and the Supreme Court emphasized this point in *Coleman*.

*Hill v. Jones,*  81 F.3d 1015, 1025-1026 (11th Cir. 1996) (citation omitted).[19]

Shortly after the Eleventh Circuit decided *Hill v. Jones*, the Supreme Court handed

down *Lewis v. Casey*, 518 U.S. 343 (1996), in which it curtailed the apparent

expansiveness of its decision in *Bounds*.  Under *Lewis* an inmate raising an

access-to-courts claim cannot merely allege a denial of access to a law library or some

form of legal assistance but must demonstrate that the lack of a law library or lack of

access to legal assistance hindered his "efforts to pursue a legal claim." *Id.* at 351.  More

importantly, *Lewis* explained that the right of access established in *Bounds* is not nearly so

generous as the *Bounds* Court seemed to imply.  Declaring that *Bounds* did not "create an

abstract, freestanding right to a law library or legal assistance," *id,* the Court describes the

---

[18]With regard to federal habeas relief, 28 U.S.C. § 2254(I) further forecloses this argument.  "The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."

[19]Petitioners relying on the "exception" in other circuits also have had no success.  *Mackall v. Angelone,*  131 F.3d 442 (4th Cir. 1997); *Bonin v. Calderon*, 77 F.3d 1155 (9th Cir. 1996); *Nolan v. Armontrout*, 973 F.2d 615, 616-17 (8th Cir.1992).

nature of the right of access.

> The foregoing analysis would not be pertinent here if, as respondents seem to assume, the right at issue--the right to which the actual or threatened harm must pertain--were the right to a law library or to legal assistance. But *Bounds* established no such right, any more than *Estelle* established a right to a prison hospital.   The right that *Bounds* acknowledged was the (already well-established) right of access to the courts . . .   In the cases to which *Bounds* traced its roots, we had protected that right by prohibiting state prison officials from actively interfering with inmates' attempts to prepare legal documents, . . . or file them, . . . and by requiring state courts to waive filing fees, . . . or transcript fees, . . . for indigent inmates.  *Bounds* focused on the same entitlement of access to the courts.   Although it affirmed a court order  requiring North Carolina to make law library facilities available to inmates, it stressed that that was merely "one constitutionally acceptable method to assure meaningful access to the courts," and that "our decision here ... does not foreclose alternative means to achieve that goal." In other words, prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts."

*Id.* at 351-52 (citations omitted).

In *Christopher v. Harbury*, 536 U.S. 403 (2002), a unanimous[20] Court rejected the claim of a widow of a murdered Guatemalan citizen that United States government officials had violated her right of court access by concealing information about her husband's fate. *Id.* at 405-06.  Justice Souter described court access claims as falling into two categories: forward-looking "claims that systemic official action frustrates a plaintiff . . . in preparing and filing suits  . . . "  and backward-looking "claims . . . of specific cases that cannot now be tried (or tried with all material evidence)."  *Id.* at 413-14.

---

[20]Justice Thomas concurred in the judgment, filing a separate opinion.  *Christopher v. Harbury*, 536 U.S. 403, 422 (2002).

While the circumstances thus vary, the ultimate justification for recognizing each kind of claim is the same.   Whether an access claim turns on a litigating opportunity yet to be gained or an opportunity already lost, the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong.   However unsettled the basis of the constitutional right of access to courts, *our cases rest on the recognition that the right is ancillary to the underlying claim*, without which a plaintiff cannot have suffered injury by being shut out of court. We indicated as much in our most recent case on denial of access, *Lewis v. Casey, supra*, where we noted that even in forward-looking prisoner class actions to remove roadblocks to future litigation, the named plaintiff must identify a "nonfrivolous," "arguable" underlying claim, *id.*, at 353, and n. 3, 116 S.Ct. 2174, and we have been given no reason to treat backward-looking access claims any differently in this respect.   It follows that the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation.

536 U.S. at 414-415 (emphasis added) (footnote omitted).[21]

*Harbury* makes plain what *Lewis* strongly implied: the right of access is subordinate to the existence of a claim.  Put another way, the existence of a claim is antecedent to a claim that the right of access has been compromised.[22]  As shall be seen, this understanding of the right of access has significant (and detrimental) consequences for the claims of the inmate class.

---

[21]To emphasize the importance of the existence of a claim, the Court explained that "the complaint failed to identify the underlying cause of action that the alleged deception compromised, going no further than the protean allegation that the . . . 'false and deceptive information and concealment foreclosed Plaintiff from effectively seeking adequate legal redress.' " 534 U.S. at 418.

[22]This, of course, follows directly from the holding in *Lewis v. Casey*, 518 U.S. 343 (1996), that an inmate must show an "actual injury" which is defined as a hindrance of "efforts to pursue a *legal claim*." *Id.* at 351 (emphasis added).  A claim which did not exist could never be hindered in any real sense.

### III. The Plaintiffs' Claims For Relief

**The Sixth Amendment Claim.**  The plaintiffs reiterate in their motion for final judgment their claim that the Sixth Amendment requires "the State of Alabama to provide counsel to indigent condemned inmates prior to the filing of their postconviction petition." As noted elsewhere, the court has already disposed of this claim; however, the plaintiffs contend that the claim has merit and assert it for the purpose of preserving it.  The court is bound by existing precedent.  The plaintiffs Sixth Amendment claims lack merit, and they are not entitled to relief.  *Coleman v. Thompson*, 501 U.S. 722 (1991); *Pennsylvania v. Finley*, 481 U.S. 551 (1987).

**The Access To Court Claim.**  The plaintiffs contend that "the federal constitutional right of meaningful access to the courts requires the State of Alabama to provide counsel to indigent condemned inmates prior to the filing of their postconviction petition."  In support of this (and their other contentions as well) the plaintiffs set forth a number of "relevant facts."  These relevant facts are presented in a manner which builds crescendo-like to an ultimate conclusion.  A review of these relevant facts is instructive.

The plaintiffs assert that Alabama is the only jurisdiction in the United States with a significant death row population which provides no state-funded lawyers in a timely manner to death row prisoners.  The court understands the phrase "timely manner" to refer to Alabama's practice of not appointing counsel prior to a death row prisoner's filing of a postconviction motion.  The plaintiffs next assert that Alabama's "unique failure" to

provide any assistance forces death row inmates to find volunteer lawyers or file petitions *pro se*. (Plts' Mot. Final Judgment at 10) The generality of this contention is immediately belied by the next sentence: "None of the sixty-one people currently pending (sic) in state postconviction proceedings had counsel appointed to the *prior to filing*." *Id.* (emphasis added) In addition, the force of the factual contention is undercut by the very fact that each of the death row prisoners had a postconviction petition pending. Next, the plaintiffs assert that while always difficult, finding volunteer lawyers has become "impossible."[23] The reasons for this impossibility identified by the plaintiffs are the "filing deadlines imposed by the [Anti-Terrorism and Effective Death Penalty Act] AEDPA and the shortened state statute of limitations, combined with the increasing number of death row prisoners in Alabama and the declining volunteer resources . . . " *(Id.* at 12)

Based on these predicates, the plaintiffs assert that "without the timely assistance of counsel, Alabama death row prisoners are executed or denied access to the courts." (*Id.* at 15) In support of this assertion, the plaintiffs state that "in the last few years" seven Alabama death row prisoners "have either had their cases dismissed or have otherwise been precluded from state court review as a result of their inability to obtain adequate

---

[23]The plaintiffs also make the assertion that the "state has relief on volunteer legal assistance for death row prisoners to ensure that its capital convictions and death sentences are reliable." Plts' Mot. for Final Judgment at 11-12. The plaintiffs provide no support for the contention that this is the manner in which Alabama insures reliability of its judgments. Elsewhere in this opinion, the court sets forth the manner in which counsel may be appointed in Alabama to represent plaintiffs for their postconviction remedies. The court emphasizes therefore that the "failure" about which the plaintiffs complains is the failure of the state to provide counsel for the investigation and preparation of postconviction petitions.

assistance." *Id.* at 15.  As support for this factual contention, the plaintiffs cite in a footnote several cases, a canvas of which is instructive.

In *Arthur v. State*, 820 S02d 886 (Ala. Crim. App. 2001), the defendant was convicted of murder in a third trial after the state court reversed his conviction following new trials.  During his third trial, Arthur acted as co-counsel and in his postconviction petition raised a claim that his trial counsel was ineffective for failing to object to him serving as co-counsel.  It seems that in closing argument in the penalty phase, Arthur addressed the jury and asked them to sentence him to death.  Eleven of the jurors did just that.  The ineffectiveness issue was decided adversely to Arthur on direct appeal.  *Arthur v. State*, 711 So.2d 1031 (Ala. Crim. App. 1996), aff'd, 711 So.2d 1097 (Ala. 1997). Arthur's postconviction petition was filed more than two years after his conviction became final, and it was accompanied by a motion requesting that he be allowed to file the motion out-of-time.  In dismissing the petition on limitations grounds, the court held that the limitations period applied equally to all cases and to all claims, even constitutional claims.

The plaintiffs state that *Ex parte Dallas*, 845 S0.2d 780 (Ala. 2002), shows that the defendant's execution date was set where a "deadline [was] missed for appealing denial of Rule 32 petition."  The implication is that the deadline was missed because Dallas did not have the assistance of counsel.  That is puzzling in light of Justice Johnstone's dissent from the setting of Dallas' execution date.

> I am constrained to observe further that the ineffective assistance of counsel claims in the now pending federal habeas corpus petition seem

worthy of consideration if the federal court can reach the merits. Dallas raised these same claims in his Rule 32, Ala. R.Crim. P., petition in state court. After the state trial court heard and denied the Rule 32 petition, Dallas's Rule 32 *counsel* missed the appeal deadline, and the Court of Criminal Appeals dismissed Dallas's appeal. After Dallas then obtained a declaration by the trial court that the appeal time had been tolled during the pendency of a post-denial motion, Dallas refiled his appeal of the denial, but the Court of Criminal Appeals again dismissed the appeal as untimely. When Dallas petitioned this Court for a writ of certiorari to review the latter dismissal of the refiled appeal, this Court denied certiorari review because Dallas's Rule 32 counsel had violated Rule 40(d)(1), Ala. R.App. P., by failing to file a timely application for rehearing before the Court of Criminal Appeals on the issue of its dismissal of the refiled appeal.

*Ex parte Dallas,* 845 So.2d 780, 781 (Ala.,2002) (emphasis added).

The plaintiffs next cite *Barbour v. Haley*, 145 F.Supp.2d 1280 (M.D. Ala. 2001), for the proposition that "failure to file notice of appeal from denial of Rule 32 petition may bar review of claims." There is, of course, nothing remarkable about this type of procedural bar which has long been part of the federal habeas landscape. *See e.g., Wainwright v. Sykes*, 433 U.S. 72 (1977). Even so, the *Barbour* court stayed Barbour's execution to consider his claim of actual innocence and additionally noted claims "that might demand consideration on the merits . . . " 145 F.Supp.2d at 1289.

The court will not belabor the point. The cases mentioned above and others cited by the plaintiffs are scant support if at all for their proposition that in the absence of counsel, they have been denied access to the courts. To be sure, in some instances collateral review of some of their claims has been denied on procedural or limitations grounds, but these denials are not denial of access. If the right of access is properly

21

understood as a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights which may not be hindered, *see Lewis v. Casey*, 518 U.S. 343, 352 (1996), then the plaintiffs' right of access has not been denied because their claims have been presented.[24]

Indeed, the plaintiffs' arguments show that the plaintiffs have conflated the right of access with obtaining postconviction review. The plaintiffs argue that the denial of counsel puts the plaintiffs at risk of execution "without ever having obtained collateral review of their convictions or death sentences." But that observation, even if correct, does not mean that any member of the plaintiff class has been constitutionally hindered in presenting an existing claim to a court. Indeed, the very nature of the manner in which the plaintiff class posits their claims exposes their error. As noted earlier, the plaintiffs contend that the failure to provide them counsel for the investigation and initiation of state postconviction motions is a denial of access. But that contention runs squarely contrary to *Lewis v. Casey*'s admonition that the right identified in *Bounds* "guarantees no particular methodology but rather the conferral of a capability--the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts. " 518 U.S. at 356.

The plaintiffs' claim, however, seems to be that under the circumstances facing the plaintiffs only appointment of counsel satisfies the right of access and that the

---

[24]Later, the court will discuss the issue of those claims which by their very nature often cannot be raised except in a postconviction motion.

appointment must be well prior to the end of the limitations period for filing

postconviction petitions so that investigation and petition preparation is not impaired.  In

short, the plaintiffs demand is the very demand that *Lewis* foreclosed; a demand that

inmates be provided the litigation capacity to develop claims not contemplated or not

known.[25]

      The foregoing analysis has been merely a prelude to addressing the most beguiling

argument of the plaintiffs, only appointment of counsel can insure "meaningful" access.

In succinct form, the argument is that

> •     Access to courts must be "meaningful" as required by *Bounds*.  430 U.S. at
>     823.
>
> •     Absent appointment of counsel Alabama's complex and labyrinth
>     postconviction procedures deny meaningful access because unaided,
>     condemned inmates are not able to present their claims to obtain a fair
>     judicial determination.
>
> •     Alabama "exploits" inmates' inability to meet postconviction requirements
>     by seeking dismissal of petitions on grounds of lack of specificity, failure to
>     state a claim, procedural defaults or limitations.
>
> •     Only by appointment of counsel can the state insure that death row
>     prisoners' right of meaningful access is protected.

      There is no doubt that both state and federal postconviction procedures have

---

[25]The plaintiffs also complain that without counsel many death row inmates who file
postconviction petitions *pro se* "are at risk of adverse rulings or summary dismissals."  Plts' Mot. for Final
Judgment at 18.  Of course, being "at risk" is a far cry from the actual injury requirement necessary to
support a denial of access claim.  In addition, an adverse ruling can hardly ever constitute a denial of
access because an adverse ruling unequivocally means that a court in some fashion has determined the
claim.  "The right of access to court cannot, of course, be equated with a right to be free of all substantive
legal obstacles . . . " LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 755 (2ⁿᵈ Ed. 1988).

become byzantine structures littered with procedural land mines.  But the complexity of

the postconviction process and the difficulties of surmounting it without counsel cannot as

a matter of law be equated to a denial of meaningful access even for condemned prisoners.

Foremost, such a conclusion would effectively nullify the Supreme Court's holding in

*Coleman v. Thompson*, 501 U.S. 722 (1991), that "*Finley*[26] and *Giarratano*[27] established

that there is no right to counsel in state collateral proceedings."  *Id.* at 755.  It would be

odd indeed that the unenumerated right of access would swallow whole the Sixth

Amendment jurisprudence related to postconviction proceedings.

In addition, the court cannot conclude that "meaningful access" is as all

encompassing as demanded by the plaintiffs.  The plaintiffs' vision of the right is one that

enables them to go beyond merely advancing known claims; it is a claim that they have to

right to counsel to investigate and develop claims undiscovered at the conclusion of their

direct appeals.  That vision is informed by the view that postconviction proceedings are

necessary to insure the reliability of criminal proceedings.  But that plainly is contrary to

the view of the Supreme Court which does not view post conviction proceedings as

integral to the criminal process.

> The meaningfulness requirement generally requires much less of the
> government when the right involves postconviction review, for, in the
> Court's view at least, postconviction review is not integral to the reliability
> of the trial process, and any reliability interest it might serve will not always

---

[26]*Pennsylvania v. Finley*, 481 U.S. 551 (1987).

[27]*Murray v. Giarratano*, 492 U.S. 1 (1989)

outweigh the state's interest in structuring its postconviction process in a manner it deems appropriate.  As a result, the Court tends to apply the meaningfulness requirement more flexibly in the postconviction context, emphasizing the government's sovereign authority over its criminal processes.

Celestine Richards McConville, *Protecting the Right to Effective Assistance of Capital Postconviction Counsel: the Scope of the Constitutional Obligation to Monitor Counsel Performance*, 66 U. Pitt. L. Rev. 521, 532 (2005) (footnote omitted).

In sum, the court concludes that as a matter of law the right of meaningful access does not require the State of Alabama to provide counsel to death row prisoners for the purpose of investigating and the filing of postconviction proceedings.[28]  That said, there is one possible exception which must be addressed.  That *possible* exception is whether *Hill v. Jones,* 81 F.3d 1015, 1025-1026 (11th Cir. 1996) remains good law.  If so it precludes a finding that a right to counsel exists for advancing claims which could be raised for the first time only in a postconviction proceeding.  *Hill* has not been overruled by the Eleventh Circuit sitting *en banc* or by the Supreme Court.  Thus, the only possibility is that subsequent controlling cases have undermined its validity.  In *Daniels v. United States*, 532 U.S. 374, 387 (2001), Justice Scalia in a concurring opinion noted that the Court had "left open the question whether such ineffective assistance can establish a constitutional violation....").  Like *Hill,* other courts have concluded that the possible exception is simply not available.  *See Martinez v. Johnson*, 255 F.3d 229 (5th Cir. 2001);

_____

[28]Given this conclusion, the court does not need to address the plaintiffs' argument that Alabama's Rule 32 process is an external impediment sufficient to toll the running of § 2244(d)(1)'s limitation period.  *See* note 9, *infra.*

*Mackall v. Angelone*, 131 F.3d 442 (4th Cir. 1997) (*en banc); Nave v. Delo*, 62 F.3d 1024

(8th Cir. 1995).  Both *Hooks* and *Hill* remain controlling law.  The claim that the State of

Alabama is constitutionally required to appoint counsel to death row inmates for the

investigation, preparation and prosecution of their state postconviction challenges to their

convictions must be denied with prejudice.

**The Legal Assistance Claim.**  The plaintiff class further contends that if the

appointment of counsel is not constitutionally required, the state must provide some form

of legal assistance.  That, of course, is what *Bounds* requires.  But here is what the

plaintiff class contends.

> The onerous procedural and factual requirements of Rule 32 litigation in Alabama, the State of Alabama's exploitation of the Plaintiffs' inability to meet these requirements; and the heightened attention to fairness and reliability that attends a case in which the individual has been sentenced to death obligate the State of Alabama to provide more assistance in order to satisfy the constitutionally mandated duty to provide meaningful access to the courts.  It is incumbent upon this Court to declare that the State of Alabama is currently failing to provide death row prisoners with meaningful access to the courts, and order the State to alter the system to provide members of the Plaintiff class with this access.  This may include any of the following: a change in the procedural and factual requirements for postconviction (sic); increase in the caps on compensation and alter the system of appointment of counsel in postconviction; and/or set up a system for facilitating factual development and legal assistance that the meets the constitutional requirement of meaningful access.

Plts' Mot. For Final Judgment at 51.

The plaintiff class is not entitled to relief on this claim.  Their claim here is

precisely the type of deficient "protean" claim which failed in *Christopher v. Harbury.*

Most assuredly, the plaintiffs do not identify any existing claim which they lost or the presentation of which was hindered within the meaning of *Lewis*.

## A Concluding Postscript

At the outset of this opinion, the court mentioned that this case was not about the death penalty, and that observation is correct. However, there is an aspect of this case which may not be readily apparent to a person reading this opinion who has not read all of the briefs and not heard all of the arguments. It is to this aspect which the court now turns with full recognition that these observations are not necessary to the decision in this case. Nonetheless, the court deems these observations appropriate.

It is not hyperbole to view this case as undergirded by anguish, the anguish of death penalty lawyers who believe the death penalty system as broken.[29] The anguish the plaintiffs' lawyers express about the postconviction process does not appear founded on emotion; plainly, it is founded on logic. This is a practical logic which leads inexorably to

---

[29]Lead counsel Bryan Stevenson reportedly has stated that he "believes that there are too many problems of fairness and reliability with American's criminal justice system to permit capital punishment . . ." THE LAW SCHOOL: THE MAGAZINE OF NEW YORK UNIVERSITY SCHOOL OF LAW, Autumn 2004, at 52. There is support for that view. *See* James S. Liebman et al., A Broken System: Error Rates in Capital Cases, 1973-1995 (http://papers.ssrn.com/abstract=232 712). *See also* O'Connor Questions Death Penalty, N.Y. TIMES, July 4, 2001, at A9 ("If statistics are any indication, the system may well be allowing some innocent defendants to be executed."). In *Atkins v. Virginia*, 536 U.S. 304 (2002), Justice O'Connor acknowledged concern about the recent exoneration of several death row inmates, especially some who were mentally ill. "[W]e cannot ignore the fact that in recent years a disturbing number of inmates on death row have been exonerated. These exonerations have included at least one mentally retarded person who unwittingly confessed to a crime that he did not commit." *Id*. at 320 n.25. As might be expected there are strong opposing views. John McAdams, *It's Good, and We're Going to Keep It: A Response To Ronald Tabak*, 22 CONN. L. REV. 819 (2001); *Death Penalty Paper*, <http://www.prodeathpenalty.com/DP.html>. For a dispassionate, history and presentation of both sides of the argument, *see* STUART BANNER, THE DEATH PENALTY (2002).

a conclusion which may be rational but is remarkably at odds with our traditional notions of the nature of litigation.  It is a practical logic which is founded also on the belief that in the face of the limitations periods and other hurdles imposed on collateral review petitions, there are not enough lawyers willing or able to undertake representation of members of the plaintiff class at a point where a full review and investigation of a case already once lost can be mounted.  That "point" is "prior to filing" their petition for post-conviction review.  (Plts. Mot. for Final Judgment at 10).  The anguished rationale is further expressed in the plaintiffs' lament that

> Alabama has never created a state-funded agency to provide legal services to death row prisoners.  The state has relied on volunteer legal assistance for death row prisoners to ensure that is capital convictions and death sentences are reliable.

*Id.* at 11-12.

Earlier, the court said that the plaintiffs' argument was at odds with traditional notions of the nature of criminal litigation, and that comment requires explanation. Almost 30 years ago, the Supreme Court commented on the importance of the trial on the merits in a criminal case.

> A defendant has been accused of a serious crime, and this [the trial] is the time and place set for him to be tried by a jury of his peers and found either guilty or not guilty by that jury.  To the greatest extent possible all issues which bear on this charge should be determined in this proceeding: the accused is in the courtroom, the jury is in the box, the judge is on the bench, and the witnesses,  having been subpoenaed and duly sworn, await their turn to testify.  Society's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens.  Any procedural rule which encourages

28

the result that those proceedings be as free of error as possible is thoroughly
desirable, and the contemporaneous-objection rule surely falls within this
classification.

   We believe the adoption of the *Francis* rule in this situation will have the
salutary effect of making the state trial on the merits the "main event," so to
speak, rather than a "tryout on the road" for what will later be the
determinative federal habeas hearing.  There is nothing in the Constitution
or in the language of § 2254 which requires that the state trial on the issue of
guilt or innocence be devoted largely to the testimony of fact witnesses
directed to the elements of the state crime, while only later will there occur
in a federal habeas hearing a full airing of the federal constitutional claims
which were not raised in the state proceedings.

*Wainwright v. Sykes*, 433 U.S. 72, 89-90 (1977).[30]

   But the briefs of the plaintiff class in this case would lead a reader to a far different

conclusion.  For the plaintiffs the "main event" is the collateral proceeding in which all of

the constitutional errors at trial may be exposed to demonstrate the unreliability of a final

judgment of conviction.  The very statement of this viewpoint exposes the difficulty of

sustaining it.

   Throughout these proceedings, the arguments of the plaintiff class have obscured

one significant aspect of their status during collateral proceedings.  When the members of

the plaintiff class are eligible to commence collateral proceedings their convictions have

become final under state law.  Indeed, this change in the status of the members of the

plaintiff class signifies that the criminal process is concluded.  Now they are embarked on

a very different kind of journey with very different interests influencing the decisions

-----

[30]The reference to the *Francis* rule is to the cause and prejudice requirement established in
*Francis v. Henderson*, 425 U.S. 536 (1976).

29

which courts must make.  As *Moffitt* underscores, postconviction is a *review* of the trial proceedings, not a new trial.  While the court does not discount the utility of postconviction review, marshaling substantial resources after a judgment of conviction is final seems a misallocation of society's limited resources.  It is at the guilt and penalty phases of a death penalty trial[31] that the State is constitutionally required to assure defendants are represented by effective counsel.  The most efficacious way to assure the reliability of a criminal judgment is to assure the effectiveness of the criminal trial, not the proceedings available after the judgment of conviction.

Justices of the Supreme Court of the United States and the State of Alabama have recognized the difficulties which death row prisoners face in pursuit of collateral relief.  They are formidable, and the assistance of counsel for the investigation, initiation and prosecution of postconviction remedies undoubtedly would benefit death row prisoners whose circumstances severely limit their capabilities.  However, as the foregoing discussion reflects, the court cannot conclude that the constitutional right of access to court mandates that the State of Alabama provide counsel.  The court will enter judgment in favor of the defendants.

Done this 23rd day of January, 2006.

_____/s/Charles S. Coody_____
CHARLES S. COODY
CHIEF UNITED STATES MAGISTRATE JUDGE

---

[31]As well as the direct appeal, of course.

30